## MOYER *v.* PACKARD MOTOR CAR CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—EVI-DENCE—INFERENCES TO BE DRAWN.

    In proceedings under the workmen's compensation law, in determining the ultimate facts, the industrial accident board may draw rational and natural inferences from the evidence.

2. SAME—COURSE OF EMPLOYMENT—EVIDENCE—INFERENCES.

    The conclusion of the industrial accident board that an employee was in the course of his employment when fatally injured in an elevator shaft, although he was forbidden the use of the elevator and there was no evi-dence that any duty called him to the elevator shaft *held*, wholly unsupported by evidence.

Certiorari to Industrial Accident Board.   Submitted January 21, 1919.   (Docket No. 78.)   Decided April 3, 1919.

See notes in L. R. A. 1916A, 40, 232; L. R. A. 1917D, 114.

Mary Moyer presented her claim for compensation against the Packard Motor Car Company for the accidental death of her son in defendant's employ. From an order awarding compensation, defendant brings certiorari. Reversed, and order vacated.

*Angell, Bodman & Turner* and *Clifton G. Dyer*, for appellant.

*Butzel & Butzel* (*Harry L. Weinstein*, of counsel), for appellee.

OSTRANDER, J. Claimant's decedent, Edward Moyer, was a night watchman employed by the defendant. He had been so employed for eight days. The buildings of defendant's plant are numbered, one building, known as No. 15, was five stories high. In this building it was Moyer's duty to act as night watchman of the third, fourth and fifth floors. In building No. 15 was an elevator, used for freight only, which ran from the first to the fifth floor. Moyer reported to the foreman of the watchmen at the front gate of the plant at about 5:30 o'clock on the morning of March 17. He was last seen by any one who gave testimony going from the front gate towards the building, which was about 100 yards from the gate. It was his last trip or round before quitting work. At some time between 5:32 and 5:35 o'clock, his body was found in the bottom of the elevator shaft, which was four feet below the level of the first floor. He died shortly afterwards.

Testimony as to the extent and exact nature of Moyer's injuries is rather meager. A physician who saw him just before he died at the hospital to which he was immediately taken found, he says, a hemorrhage over one ear which, with other symptoms, led him to believe there was a fracture at the base of the skull and a broken arm. His examination was super-

ficial as it was evident that the man was dying. An autopsy was performed, but not until the body had been embalmed, making it rigid. The doctor found a fracture of right forearm and of the right wrist, lacerated contusion of the right eye. He does not describe a fractured skull, and says he concluded the man died from internal injuries—"rupture of the intestines, something of that kind."

The undisputed evidence shows that Moyer had no duties to perform on the first or second floors of the building. It was his duty to ascend by stairs to the third floor and to inspect to some extent the third, fourth and fifth floors, leaving a record of his presence there by punching or otherwise manipulating clocks or machines. No work was carried on during the night in question on the third, fourth or fifth floors. Work was carried on on the first floor. The elevator shaft was inclosed, there being a safety gate operating automatically at each floor and, in addition, fire doors made of heavy wood and covered with tin or some other metal. At about 5:30 o'clock, the night operator of the elevator, quitting work, left it on the first floor, locked, the fire doors on each of the floors being closed. Considerable effort was required to open and close the fire doors. At the time Moyer's body was found, the elevator was at the fifth floor, and on each the second, third, fourth and fifth floors the fire doors were closed. On the first floor the fire doors were open and the automatic safety gate down and in place. Moyer had no right to use the elevator and, so far as is disclosed, never had used it to the knowledge of the foreman or any official of the defendant company. It was an electric elevator. Both the night and day operators of the elevator had keys which would unlock it or unlock the box which controlled it, but a piece of metal could be used to perform the same duty which the keys performed. The elevator was 10 by 20 feet in dimen-

sions. At each floor, as the elevator reached it, the safety gate was automatically lifted. There was then a space of 15 inches between the elevator and the fire door. The elevator was inspected at 4:30 o'clock on the afternoon of March 16, and again at 7 o'clock on the morning of the 17th after the accident, and on both occasions found to be in perfect running order. Moyer had been instructed by the foreman of the plant watchmen not to touch or go upon the elevator under any circumstances. Other facts which, like some of those already recited, may excite speculation but support no definite conclusion as to how Moyer came to be injured, are the following: Under the bottom of the elevator there was suspended a telltale—a cord with a stick at the end of it. Its purpose was to warn any one who was looking into the shaft of the approach of the descending car. A portion of this was found in the pit with the body of Moyer. Mr. Moyer had trouble with his feet, and had been seen removing his shoes and putting talcum power in them or in his hose. A package of talcum powder was found on his body.

In the opinion of the industrial accident board, it is said, among other things:

"There is a lot of testimony, but the board is not able to figure out how this man fell to his death. He was there and about his work and was found in the elevator pit within a few minutes after the elevator man left the elevator. The theory of the applicant is that the deceased, in making his rounds on the morning in question, became aware of some unusual condition, and for some reason, endeavored to look into the elevator shaft, and in so doing, fell into the elevator pit and met his death. What took the elevator from the first floor to the fifth floor, we do not know. It may be possible that the elevator man is mistaken and that he did not leave the elevator at the first floor, although there is no testimony to the contrary.

"The man was a watchman. It was his business to

keep watch or guard. The duties of a watchman necessarily call for a careful supervison of the building or locality to which he is assigned, and if something unusual occurs in any part of the building or in the elevator, or the elevator shaft, which is a part of the building, we believe it would be incumbent upon him to take proper measures to correct the improper condition. It was said, in *Wishcaless* v. *Hammond, Standish & Co.*, 201 Mich. 192, that in a proceeding for workmen's compensation on account of the death of an employee, where the facts proven necessitate a natural and reasonable inference that the accident happened while the employee was in the course of his employment, the employer, if he disputes the claim, has the burden of showing that the accident did not so occur.

"We do not know but that some workman other than the deceased employee used this elevator and left some of the doors open, and that the watchman noticed the improper condition, and in endeavoring to ascertain the cause of the same, met his death. The theories as to how the accident could happen are not of much benefit to us. Nobody knows just how it did happen, but the man evidently fell into the elevator shaft while in the course of performing his duties, and we think that the evidence warrants the conclusion that the accident arose out of and in the course of the employment of the deceased. Where an employee is killed, and facts are proven, the natural and reasonable inference from which is that the accident happened while the deceased servant was engaged in his employment, the master has the burden of proving the contrary. *Papinaw* v. *Railway Co.*, 189 Mich. 441."

In determining the ultimate facts, the industrial accident board may draw rational and natural inferences from the evidence. The board concluded:

"(1) If something unusual occurs in any part of the building or in the elevator, or the elevator shaft, which is a part of the building, we believe it would be incumbent upon him (Moyer) to take proper measures to correct the improper condition.

"(2) Nobody knows just how it did happen, but the man evidently fell into the elevator shaft while in the course of performing his duties, and we think

that the evidence warrants the conclusion that the accident arose out of and in the course of the employment of the deceased."

The evidence supports the conclusion that the man in some way got into the elevator shaft and fell to the bottom. But there is no evidence supporting the inference that his duty called him to the shaft or that he was performing any duty when he fell into it. The undisputed evidence shuts him out of the shaft upon every floor except, perhaps, indulging inference, the first floor, where the fire doors were found open and the safety gate in place. The elevator was in proper working order. Therefore, he could have gained entrance to the shaft on the first floor only by climbing over or rolling under the safety gate, or by opening the fire doors and attempting to use the elevator. Mr. Moyer had no duties to perform on the first floor of the building, and was forbidden to make use of the elevator.

The facts, material facts, have been stated. Any one so disposed may exercise imagination in using them to construct a history of what occurred. But imagination so indulged will fail to connect the presence of Moyer in the shaft with the performance of any duty. The facts do not warrant the application of the principle relied upon by the board and stated in the *Papinaw* and the *Wishcaless Cases*. Wishcaless was operating the elevator in the shaft of which his body was found, and Papinaw was in a place where his duties required him to be.

We are of opinion that the conclusion of the board is wholly unsupported by evidence and that its order in the premises must, therefore, be vacated.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.