TWIN PEAKS CANNING CO. et al. v. INDUSTRIAL COMMISSON OF UTAH.

No. 3615.    Decided March 10, 1921.    (196 Pac. 853.)

1. MASTER AND SERVANT—REVIEWING COURT WILL ONLY ASCERTAIN WHETHER THERE IS ANY EVIDENCE SUPPORTING FINDINGS OF INDUSTRIAL COMMISSION. On proceedings to review an award of the Industrial Commission under the Workmen's Compensation Act, the court will examine the evidence only to ascertain whether there is any substantial evidence in support of the findings and whether it has acted without or in excess of its jurisdiction.[1]

2. MASTER AND SERVANT—INJURY OCCURRING "IN COURSE OF EMPLOYMENT," COMPENSABLE. Under the Workmen's Compensation Act, as amended by Laws 1919, c. 63, covering accidents arising out of or in course of the employment, if the accident.

[1] *George A. Lowe & Co.* v. *Industrial Commission*, 56 Utah 519, 190 Pac. 934; *McVicar* v. *Industrial Commission*, 56 Utah 342, 191 Pac. 1089; *Littsos* v. *Industrial Commission*, 57 Utah 259, 194 Pac. 338; *Utah Fuel Co.* v. *Industrial Commission*, 57 Utah 246, 194 Pac. 122; *Ogden City* v. *Industrial Commission*, 57 Utah 221, 193 Pac. 857; *Globe G. & M. Co.* v. *Industrial Commission*, 57 Utah 192, 193 Pac. 642.

occurred in the course of the employment, it is not necessary
to show that it arose out of the employment.

3.  MASTER AND SERVANT—INJURY TO YOUTHFUL WORKER PLAYING
    JOKE ON A COMPANION ON ELEVATOR HELD "IN COURSE OF EM-
    PLOYMENT" WITHIN COMPENSATION ACT. Where 15 year old
    boy entering a freight elevator to return to his work from
    a floor visited during an interval of leisure was killed by the
    movement of the elevator when he turned on the power, pre-
    viously shut off by himself as a joke on a companion who was
    coming up and failed to disengage the switch on the elevator
    when it stopped between the floors, an award under the Work-
    men's Compensation Act was justified on the theory that the
    accident occurred "in the course of employment."

4.  MASTER AND SERVANT—INJURIES TO YOUTHFUL WORKER USING
    ELEVATOR CONTRARY TO ORDERS HELD NOT "PURPOSELY SELF-IN-
    FLICTED," WITHIN COMPENSATION ACT. Where a 15 year old
    boy was killed as a result of a practical joke on his companion
    while they were playing with an electric freight elevator which
    they used for reaching another floor visited during a lull in
    their work, the injury was not "purposely self-inflicted" within
    the Workmen's Compensation Act so as to bar recovery of bene-
    fits, though such use of the elevator was in violation of orders.

Original application by the Twin Peaks Canning Company
and the London Guarantee & Accident Company, Limited,
for a writ of review to the Industrial Commission to review
an award under the Workmen's Compensation Act in favor
of Edith Bohling on account of the death of her minor son,
Charles Brandley.

AWARD AFFIRMED.

*Booth, Lee, Badger & Rich,* of Salt Lake City, for plaintiffs.

*Harvey Cluff,* Atty. Gen., and *J. R. Robinson,* Asst. Atty.
Gen., for defendant.

FRICK, J.

This is an original application to this court for a writ of

Certiorari.   Award Affirmed.

review.    The application is made pursuant to the provisions
of chapter 100, Laws Utah 1917, as the same is carried into
Comp. Laws Utah 1917, §§ 3061 to 3165, inclusive, and as
amended by chapter 63, Laws Utah 1919.

One Edith Bohling made application in due time and form
to the Industrial Commission of Utah, hereinafter called Com-
mission, to obtain compensation for the death of her son, one
Charles Brandley, who was 14 years and 10 months of age
at the time of his death.  The Commission awarded the moth-
er compensation as a partial dependent in the sum of $7.71
per week for a period of 312 weeks, and, in addition thereto,
the sum of $150 for funeral expenses.  The award was based
upon the decision and findings of the Commission.  The de-
cision reads as follows:

"It appears that Charles Brandley was killed in an accident
on the 11th day of August, 1920, at Murray, Utah.  Decedent had
been employed by the defendant Twin Peaks Canning Company
for several weeks, his work consisting of caring for the cans in
the capping department on the main floor.  About the hour of
11:30 a. m. the machine had stopped, and for some purpose the
deceased left his place of work, and, using the freight elevator,
ascended to the next floor, and, in watching another boy descend
in a like manner, playfully shut off the power of the elevator,
causing the elevator to stop between the first and second floors.
The decedent climbed to the second floor and turned the power
on.  The elevator ascended at once and crushed the decedent.  It
is alleged by the applicant, Edith Bohling, that she is the mother
of the decedent by a former marriage; that subsequently she was
married to Joseph Bohling and maintained a home in which
the decedent had lived for the past seven years; that all earnings
of the decedent, both in the past and at the time of said accident,
were given to the applicant and used for herself and family's sup-
port."

While the findings of fact in substance follow the decision,
yet the findings are very general, merely indicating when
and where the accident occurred, the average weekly wage
earned by the deceased, and that the applicant was "partially
dependent upon the deceased."  In the so-called conclusions
of law, after fixing the amount to be paid, etc., the Commis-
sion further says:

"It appears that the employés were cautioned against using the elevator except under condition which the work demanded and then only by boys whose work required it.  However, this rule does not appear to have been enforced; also that not only the decedent, but other boys, used the elevator to go to the second floor; also that they left their post when the machines were stopped during working hours.  This practice was indulged in to such an extent as to suggest common practice.  The Commission concludes that the decedent was within the course of his employment at the time of the accident, although he may not have been doing that which his employment required, but that which his employment permitted and allowed.  The question of whether or not the decedent had business in going to the second floor is not now a matter that can be definitely determined.  It does appear, however, that he had made the trip before for the purpose of talking to a friend; also that he sometimes ate his lunch on said floor."

It is not easy to understand why the foregoing statements are incorporated into the so-called "conclusions" of the Commission.  It is, however, immaterial what the statements or findings of the Commission are called, and we have inserted them here only for the purpose of showing what induced the Commission to make the award in this case.

The facts, in substance, are as follows:

Charles Brandley, hereinafter called the deceased, entered the employ of the Twin Peaks Canning Company, hereinafter called canning company, on the 21st day of July, 1920.  The canning company operated a canning establishment composed of a two-story building, and the deceased and his "chum" Alvin Mitchell were working on the first floor while several other boys were working on the second floor of the establishment.  There were perhaps a dozen or fifteen boys engaged in the establishment.  It was the duty of the deceased and Mitchell to "catch" the cans after they were filled with vegetables in the canning room on the second floor when the same were passed down to them by gravity by means of what is called a "chute" and to place the cans at a place indicated for them on the first floor.  There was an electric elevator connecting the two floors which was used to take the empty cans as they arrived at the canning establishment to the sec-

ond floor.   Neither the deceased nor Mitchell was required to perform any duties whatever on the second floor, nor was either required to go there for any purpose.   It seems that the cans went through some sort of a machine on the second floor, and that was also the case when they reached the first floor, and the duties of the deceased and Mitchell were confined to the machine on the first floor.   The cans, however, would not be placed in the chute in a continuous stream, so that there were intervals of rest, or intermissions, at which times the machines were not in operation.   The deceased and Mitchell were, however, supposed to remain at their posts so that they would be prepared to take up their work at any time, and as soon as the machines commenced operating after the intermissions, which might occur at any moment.   The evidence is to the effect that when the machines were at rest both the deceased and Mitchell, and especially the deceased, would frequently, by means of the elevator, ascend from the first to the second floor.   The deceased sometimes during the noon hour would go to the second floor by means of the elevator to eat his lunch which he brought from home.   One of the boys testified that the deceased went up to the second floor on the elevator "almost daily" between the 21st day of July, 1920, the day the deceased commenced work, and the 11th day of August following, when he was killed.   On the 11th day of August aforesaid the deceased and Mitchell were working on the first floor as before stated, when, at about 11:30 a. m., the machines stopped, and the deceased, by means of the elevator, went from the first to the second floor, operating the elevator himself.   After the deceased had reached the second floor, and after the elevator had been returned in a manner the testimony does not make very clear to the first floor, Mitchell also went into the elevator and adjusted the switch so as to start the elevator upwards.   It seems there was one switch on the elevator by means of which the power could be turned on to operate the elevator, and that there was also another switch on the second floor by means of which the power could be turned either on or off at that place. When Mitchell thus attempted to go from the first to the

second floor, and when he had reached a point "a little more than halfway up," between the two floors, ·the deceased, in attempting a practical joke or prank, disengaged the switch on the second floor and shut off the power from the elevator, leaving Mitchell in it midway between the two floors. Mitchell, it seems, did not disengage the switch on the elevator, but left it so that if the power were turned on the elevator would continue upwards. He, however, climbed up from the elevator where it was stopped by the deceased to the second floor. While the deceased and Mitchell were on the second floor they were "joking, talking, and laughing" with the other boys who were working on that floor. There was an elevator gate on the second floor which worked automatically, so that when the elevator came up the gate would lift upwards out of the way of those using the elevator and when the elevator went down the gate would slip into place to prevent any one from·walking or falling into the elevator shaft. When the deceased had thus stopped the elevator midway between the two floors the gate was in place. The visit of the boys on the second floor had continued only for a short time on the day in question when there was some indication that the machines would go into action, and both Mitchell and the deceased were anxious to get back to their machines on the first floor. The deceased thus went to the elevator and leaned over or climbed on to the gate aforesaid and adjusted the switch on the second floor so as to let on the power. He, it seems, did this without knowing or realizing that Mitchell had left the switch in the elevator connected when he climbed out of it to the second floor. .As soon, therefore, as the deceased connected the switch on the second floor, and as he was leaning over or was on top of the gate, the elevator commenced to ascend, and the deceased was carried up on the gate against the beam, which dislocated his neck causing almost instant death. The accident thus occurred as the result of what in the books is ordinarily denominated as practical joking, horseplay, or pranks.

There is evidence in the record that the boys on the first floor were forbidden to use the elevator, and that only a few

days preceding the accident the manager had again specially instructed them not to use the elevator to pass from one floor to the other. Mitchell, the chum of the deceased, was positive in his statement that he knew nothing about such an order, and that he had received no instruction or caution, although the elevator had been used frequently by him and the deceased and others as hereinbefore stated. Another boy, however, testified that he heard the manager tell a large number of the boys not to use the elevator, and that he felt quite positive, but not absolutely certain, that the deceased was present among the number. The manager also testified that he was of the impression that the deceased was present when he cautioned the boys, but he could not state positively that such was the case. There is no direct evidence, however, that the canning company knew that the boys were using the elevator for the purpose aforesaid or the extent thereof. In view, however, that the manager testified that only a short time before the accident he had cautioned the boys against using the elevator, he therefore must have heard that they were using it, or else he personally must have known that they, or some of them, were doing so.

While the case is not one, therefore, that it can be said that the canning company encouraged or authorized the use of the elevator for the purpose for which the boys were using it, yet the nature and frequency of the use were such that the commission was authorized to infer from the evidence that the canning company either knew or should have known that the boys were using the elevator to pass from the first to the second floor, although they could have passed between the two floors by means of a stairway which was intended for that purpose.

We remark that, in view of the many leading questions that were propounded to the witnesses both by the referee and by counsel representing the several parties, it has been somewhat difficult to make a statement within the limits of an ordinary opinion which would thoroughly reflect all of the peculiar shades, respecting the facts and circumstances. From a careful reading of the statements of all of the wit-

nesses, however, we are satisfied that the foregoing statement covers all the essential elements.

Counsel for plaintiffs insist that, in view of the evidence, the accident did not arise "in the course of the employment," and that the evidence does not support the findings of facts of the Commission or justify its conclusions of law.

This court is now firmly committed to the doctrine that it will examine into the evidence only to ascertain whether there is any substantial evidence in support of the findings of the Commission and whether it has either acted without or in excess of its jurisdiction. We refer to the following cases: *George A. Lowe & Co.* v. *Industrial Com.*, 56 Utah, 519, 190 Pac. 934; *McVicar* v. *Same*, 56 Utah, 342, 191 Pac. 1089; *Littsos* v. *Same*, 57 Utah, 259, 194 Pac. 338; *Utah Fuel Co.* v. *Same*, 57 Utah, 246, 194 Pac. 122; *Ogden City* v. *Same*, 57 Utah, 221, 193 Pac. 857; and *Globe G. & M. Co.* v. *Same*, 57 Utah, 192, 193 Pac. 642. We have cited the foregoing cases for the reason that they present a great variety of circumstances under which that doctrine was applied. In the last case cited the findings of the Commission were held not to be supported by any substantial evidence, and hence the award was set aside.

The question to be determined is: Are counsel's contentions tenable? In considering that question, it must not be overlooked that our statute materially differs from most of the statutes in force upon the subject of employers' liability in the several states of the Union. In most of the states the statutes cover accidents "arising out of *and* in the course of the employment," while our statute (chapter 63, Laws Utah 1919, § 3113) covers all accidents "arising out of *or* in the course of the employment." (Italics ours.) In order to obtain compensation under our statute, it is only necessary to show that the accident occurred "in the course of the employment," and not that it arose "out of the employment." It is important to keep the distinction in mind when the compensation cases from the various jurisdictions are considered. The Attorney General, who represents the Commission in this proceeding, earnestly contends that the award of the Com-

mission is not only supported by the undisputed facts, but that it is fully justified under our statute and the decisions. He cites and relies upon the following among other cases: *In re Loper*, 64 Ind. App. 571, 116 N. E. 324; *Hollenbach Co.* v. *Hollenbach*, 181 Ky. 262, 204 S. W. 152; *Gurski* v. *Susquehanna Coal Co.*, 252 Pa. 1, 104 Atl. 801; *In re Ayers*, 65 Ind. App. 458, 118 N. E. 386; *Thomas* v. *Proctor & Gamble Co.*, 104 Kan. 432, 179 Pac. 372, 6 A. L. R. 1145; *Barber* v. *Jones Shoe Co.*, 79 N. H. 311, 108 Atl. 690; *Rish* v. *Iowa P. C. Co.*, 186 Iowa, 44, 170 N. W. 532. To the foregoing might be added *Humphrey* v. *Ind. Comm.*, 285 Ill. 372, 120 N. E. 816; *White* v. *Kansas C. S. Co.*, 104 Kan. 90, 177 Pac. 522, and *Judson Mfg. Co.* v. *Ind. A. C.* (Cal.) 184 Pac. 1. In some of the foregoing cases the accident and consequent injury resulted from practical jokes or what is commonly called horseplay, while in others they were caused by some act of the injured workman which was forbidden by the employer, or while the workman was engaged in play during the noon hour and while he was off duty. It is not practicable to review all of the cases. We shall, however, refer to two for the purpose of showing the theory upon which the courts proceed in such cases.

In *Gurski* v. *Susquehanna Coal Co., supra,* the injured miner was working in a coal mine. Gas in dangerous quantities appeared in that part of the mine where he was working, and he was directed to leave there and work at another place a considerable distance away. That portion of the mine where the gas appeared was "closed off" by posting notices that that portion of the mine was dangerous and by warning the workmen of the danger. One of the miners, working under contract and who had before mined coal in the "fenced-off" portion of the mine, had left his "mining machine," which he wanted, in the fenced-off portion of the mine. He was again notified on the morning of the accident not to enter that part of the mine, but he did not heed the warning, and, notwithstanding the notice and warning of danger, he, with his "helper," went to get the machine in the fenced-off portion of the mine, where, while in the act of

doing so, he was suffocated by gas, and then and there died. Application was made for compensation by his wife under the Pennsylvania Compensation Act, and compensation was allowed by the court of common pleas, on an appeal to that court from the Compensation Board which had disallowed the widow's claim. A further appeal was taken to the Supreme Court of Pennsylvania, and that court affirmed the judgment of the court of common pleas. In that case it was contended, as it is here: (1) That the accident did not arise in the course of the employment; (a) that, even though that were not conceded, yet that no recovery could be had because the deceased workman had willfully disregarded the instructions and warnings of the employer. It is important to state here that the Pennsylvania Compensation Act is like ours in that it is only necessary to show that the accident arose in the course of the employment, and not that it arose out of it. The Supreme Court of Pennsylvania held that the accident arose "in the course of the employment," and that the failure of the deceased to heed and obey the warning of the coal company merely constituted negligence, which, under the act, did not affect the right of the widow to recover compensation. The case, in so far as the failure of the miner to obey the directions and warning goes, goes farther than under the evidence in this case we are asked to go by the Attorney General.

The only other case we shall attempt to review is the case of *Thomas* v. *Proctor & Gamble Co., supra.* In that case a young girl, about 17 years of age, was injured while she, with two other girls during the lunch hour, was riding around the room on a small truck which was used by the company in hauling articles from place to place in the factory. The truck was in a room where the girls ate their lunches, and after they had eaten, and with the knowledge and consent of the assistant foreman, they would ride around the room on the truck for amusement. The injured girl, on the date of the accident, just as the whistle had called the workmen to commence work, in some way fell off the truck and was injured. She made application for compensation, and it was contended that the accident did not "arise out of and in the

course of the employment.'' Under the Kansas statute the accident must arise out of and in the course of the employment in order to entitle the employé to recover compensation. The Supreme Court of Kansas held that, in view that the assistant foreman had permitted and encouraged the girls to use the truck for the purpose aforesaid on that and other occasions, for that reason, when considered in connection with other circumstances, the accident arose out of and in the course of the employment, and affirmed the award. That case, in our judgment, goes very far in upholding the award upon the ground that it arose out of the employment as well as in the course thereof.

About all of the other cases to which we have referred, and in which the accident was the result of some practical joke, prank, or horseplay, are distinguishable from the case at bar in that in those cases the injured employé did not voluntarily join in the horseplay, and at the time he was injured was discharging his usual duties in the course of his employment. Upon the other hand, there are a number of cases which are cited by plaintiff's counsel in which compensation was disallowed because the accident there in question resulted from practical joking, horseplay, or pranks, or because the injured employé had disregarded the positive orders of the employer. The following cases are illustrative of that class of cases: *Reimers* v. *Proctor Pub. Co.*, 85 N. J. Law, 441, 89 Atl. 931; *Rochford's Case*, 234 Mass. 93, 124 N. E. 891; *Moyer* v. *Packard Motor Co.*, 205 Mich. 503, 171 N. W. 403; *Pacific Coast Casualty Co.* v. *Pillsbury*, 31 Cal. App. 701, 162 Pac. 1040; *In re Loper*, 64 Ind. App. 571, 116 N. E. 324. In the last case cited, the Appellate Court of Indiana, in the course of the opinion, states the rule thus:

"The books contain many cases involving injuries to workmen caused or occasioned by some sportive act of a fellow workman done by him independent of or disconnected from the performance of any duty of his employment, and characterized by the courts and law-writers as 'practical joking,' 'skylarking,' or 'horseplay.' With practical uniformity, the courts hold both under the English act and also under the various American statutes that an injury so suffered does not arise out of the employment within the mean-

ing of the governing statute, and consequently that its compensatory provisions are not thereby invoked."

In support of the statement contained in the quotation the court cited the following cases: *Federal Rubber Mfg. Co.* v. *Havolic,* 162 Wis. 341, 156 N. W. 143, L. R. A. 1916D, 968; *Hulley* v. *Moosbrugger,* 88 N. J. Law, 161, 95 Atl. 1007, L. R. A. 1916C, 1203; *Fishering* v. *Pillsbury,* 172 Cal. 690, 158 Pac. 215; *Coronado, etc., Co.* v. *Pillsbury,* 172 Cal. 682, 158 Pac. 212, L. R. A. 1916F, 1164; *Pierce* v. *Boyer, etc., Co.,* 99 Neb. 321, 156 N. W. 509, L. R. A. 1916D, 970; and *De Filippis* v. *Falkenberg,* 170 App. Div. 153, 155 N. Y. Supp. 761. We have carefully examined every one of the foregoing cases, and while it is true that in those cases the accidents were caused as a result of skylarking, horseplay, or pranks, yet it is also true that compensation was denied upon the ground, however, that the accidents did not arise "out of the employment" or for the reason that the accidents were caused by the "willful misconduct" of the employé in question, and not because they did not arise "in the course of the employment." Indeed, in almost every one of the cases it is conceded in the course of the opinions that the accident there in question may have arisen in the course of the employment, yet that it did not arise out of the employment, and the decisions are based upon the latter ground.

What has just been said also applies to the cases first cited in support of plaintiff's contention. Moreover, in all of those cases the courts specially refer to the statute which limits recovery to accidents "arising out of the employment." The courts, in deciding those cases, however, did not hold that an employé, or, in case of his death, his dependents, may not recover compensation merely because the accident was the result of some practical joke, prank or horseplay. What the courts hold is that, in case the joke, prank, or horseplay was such that it could not be said that the accident arose out of the employment, then no recovery could be had under the statute. Our statute, as we have pointed out, is, however, broader than were the statutes under consideration in those cases, in that all accidents which arise "in the course of the

employment'' are protected as well as those which arise ''out of the employment.'' It is universally conceded, as it must be, that the term ''arising in the course of the employment'' is broader and of larger scope and effect than is the term ''arising out of the employment.'' It must, however, be obvious to all that an accident which arose out of the employment must necessarily also have arisen in the course of the employment. It is, we think, equally obvious that the converse of the proposition does not follow. The question, however, still remains: Did the accident in this case arise in the course of the employment?

As hereinbefore stated, the case at bar differs from nearly all of the so-called horseplay or practical joke cases, in this, that in most of those cases the victim of the joke or horseplay either did not participate in the joke or horseplay at all, or, if he did, it was because he was forced to do so, while in this case the deceased was the instigator and the principal, if not the sole actor, in the horseplay; that is, it is clearly inferable from the evidence that, if the deceased had not shut off the power from the elevator when Mitchell was coming up to the second floor with it, the accident would not have happened. Again, if he had not leaned over or ''climbed'' on to the gate and had not shifted the switch so as to put the power on the elevator, he would not have been hurt. In view of the foregoing, it is not entirely clear to the mind of the writer why it may not be contended with some force that the acts of the deceased were not taken in the course of his employment. Even though it be conceded that he was doing no wrong in going to the second floor, yet it does not follow from that that what he did was in the course of his employment. An act need not necessarily be wrongful to carry it beyond the course of the employment. So far as the evidence disclosed, there was no reason why the deceased should have left the first floor and gone to the second one at the time of the accident. It seems also reasonable to assume that in doing that he was not engaged in any matter or thing which in any way redounded to the good of the service in which he was engaged. Nor was it directly connected with that service.

There is, therefore, much force to the contention that the accident in question did not arise out of the employment; and there is also some force to the argument that it did not arise in the course of the employment. A careful reading of the decided cases will, however, disclose that the mere fact that the injured employé, at the time of the accident, was not in the discharge of his usual duties or was not directly engaged in anything connected with those duties, does not necessarily prevent him from recovering compensation in case of accidental injury. In that connection it must be remembered that, while a human being may do no more than what a machine might do, yet he can not be classed as a machine merely. If during his working hours there are intervals of leisure, he may, during such intervals, within reasonable limits, move from place to place on the premises of the employer in case he refrains from exposing himself voluntarily to known or visible hazards or dangers. In moving about as aforesaid, he may also have social intercourse with his coemployés, and within reasonable limits may "visit" with them. In doing these things within the bounds of reason, the employé does not go outside of the course of his employment. Every employer understands that, in case boys of immature years are employed, he is charged with notice of their natural propensities to congregate, to communicate, and to play with one another. If, therefore, the employer employs any boys and girls and gives them work which is not continuous, so that there are intervals of leisure, he must assume that during such intervals they may seek communion with their fellow workmen, and he therefore must govern himself accordingly. In thus communicating with their fellow workmen, ordinarily at least, they do not pass beyond the sphere of their employment. Nor is it necessarily detrimental to the service to permit workmen to communicate with each other, and neither the general law nor the industrial act prohibits such intercourse. The movements of the employés and their associations with one another may therefore, within reasonable limits, be well said to be in the course of the employment. While therefore, in

view of all the circumstances of this case, there may be    3
some reason for reasonable minds to differ with respect
to whether the accident in question arose in the course of the
employment, yet, in view that we are required to construe
the act liberally and with the view of effectuating its pur-
pose, and so as to protect the unfortunate employé, and, in
case of his death, those who are dependent on him for sup-
port, we feel constrained to hold that the accident in ques-
arose in the course of the employment.

It is, however, contended that the deceased violated the
orders of the canning company in using the elevator, and that
he used it for an illegitimate purpose, and that for that rea-
son the applicant may not recover compensation.   It is true
that in *Pacific Coast Casualty Co.* v. *Pillsbury, supra,* the
compensation was denied because the accident there in ques-
tion was caused by the "willful misconduct" of the boy that
was killed.   The boy there in question was sent upon an
errand, and, after returning, he, in violation of the express
instruction of the employer, used an elevator to go to the
upper story in the building and was killed.   Here again it
becomes important to have recourse to the terms of the stat-
ute.   Our statute only excluded those injuries which are
"purposely self-inflicted."   As we read the statute, there-
fore, it is not enough that the employé merely disregards
some rule, regulation, or order of the master, since such con-
duct may constitute nothing more than ordinary negligence
on the part of the employé, and mere negligence does not
destroy the right to compensation.   Nor does the fact that
the employé may have violated some rule or order necessarily
prevent him from obtaining compensation in case of acci-
dental injury.   That doctrine is illustrated and applied in
a number of the cases hereinbefore cited.   But we are here
not dealing with an adult, with a man of mature years and
experience, but with a mere boy without experience and with
an abundance of life and vigor.   Here we meet a situation
where the injured lad had outgrown his childish fears, but
had not yet reached the age when, by reason of his experience
and judgment, he would exercise a very great degree of care

or caution for his own safety and protection. While, therefore, the acts of the deceased which resulted in his death, in view of all of the circumstances, are not to be commended, yet, in view of his age and immaturity of mind, they were not unnatural nor without the bounds of reason.        4 At all events, they were not of that character which would authorize us to hold that the injuries which he suffered were "purposely self-inflicted" within the purview of the statute.

It is true that in some of its aspects this may be a borderline case, and if the deceased had been a man of mature years and experience we might have reached a different conclusion. It is, however, also true that in view of all the circumstances and for the reasons stated, and in accordance with the great weight of authority, the Commission was justified in awarding compensation to the mother of the deceased, and therefore the award should be, and it accordingly is, affirmed; costs to be taxed against plaintiffs.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.