## UTAH APEX MINING CO. et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4416.   Decided July 17, 1926.   (248 P. 490.)

1.  MASTER AND SERVANT—DEATH OF MINE CARPENTER, ELECTROCUTED WHILE LEAVING EMPLOYER'S PROPERTY AFTER WORK BY SHORTCUT, USED WITHOUT EMPLOYER'S KNOWLEDGE, HELD TO ARISE "IN COURSE OF EMPLOYMENT," AS DISTINGUISHED FROM "ARISING OUT OF EMPLOYMENT"; "COURSE OF" (INDUSTRIAL ACT [COMP. LAWS 1917, § 3113], AS AMENDED BY LAWS 1919, c. 63).   Death of carpenter for mining company, electrocuted by cable charged as result of defective insulation, while leaving company's property after work by shortcut which employes were not forbidden to use, but which was used without employer's knowledge, *held* to arise in course of employment within Industrial Act, § 3113, as amended by Laws 1919, c. 63, since "in the course of" refers to time, place and circumstances of death as distinguished from "arising out of," which refers to origin or cause.[1]

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Course of Employment.]

2.  MASTER AND SERVANT. On writ of review in compensation case, commission's findings will not be disturbed if there is any substantial evidence to sustain them.

3.  MASTER AND SERVANT. On writ of review in compensation case, court will not review evidence nor pass on its weight where there is a substantial conflict.

---

[1] *State Road Com.* v. *Ind. Com.*, 56 Utah, 252, 190 P. 544; *Twin Peaks Canning Co.* v. *Ind. Com.*, 57 Utah, 589, 196 P. 853, 20 A. L. R. 872; *Cudahy Packing Co.* v. *Ind. Com.*, 60 Utah, 161, 207 P. 148, 28 A. L. R. 1394; *Utah Copper Co.* v. *Ind. Com.*, 62 Utah, 33, 217 P. 1105, 33 A. L. R. 1327.

Corpus Juris-Cyc. References:
[1]  Workmen's Compensation Acts C. J. p. 84 n. 61.
[2]  Workmen's Compensation Acts C. J. p. 122 n. 40.
[3]  Workmen's Compensation Acts C. J. p. 123 n. 41.

Proceeding under the Workmen's Compensation Act by Mrs. Vada Titcomb for the death of William Titcomb, her husband, claimant, opposed by the Utah Apex Mining Company, employer, and the Ætna Life Insurance Company, insurer. To review an award of compensation by the Industrial Commission the employer and insurer bring writ of review.

AWARD AFFIRMED.

*Bagley, Judd & Ray*, of Salt Lake City, for plaintiffs.

*Harvey H. Cluff*, Atty. Gen., and *J. Robert Robinson*, Asst. Atty. Gen., for defendants.

THURMAN, J.

On September 18, 1925, William Titcomb, an employe of the plaintiff Utah Apex Mining Company, within the provisions of the Utah Industrial Act was killed by coming in contact with a cable charged with electricity. His widow, Vada Titcomb, sole surviving dependent of deceased, made application to the Industrial Commission for compensation. A hearing was had on said application, witnesses were sworn and examined, and the commission made findings of fact, conclusions therefrom, and an award allowing applicant the maximum compensation provided in the Industrial Act (Comp. Laws 1917, §§ 3061—3165, as amended), and $150 for funeral expenses. An application for a rehearing was denied, and the case is brought before us on writ of review.

The award is assailed on the grounds that the accident which resulted in the death of deceased did not "arise out of or in the course of his employment." That is the only question to be determined, the jurisdictional facts being either admitted or conclusively proven.

Among other facts the commission found that deceased was employed by the plaintiff mining company as a carpenter; that he was earning a sufficient wage to entitle his dependent to the maximum compensation; that on the date of his death after his shift was finished and while on his way home from work he was fatally injured on the company's property in some unknown manner by coming in contact with a live wire cable, resulting in his electrocution. The commission further found:

"There were no eyewitnesses. Deceased did not follow the usual means of ingress and egress to the mining company's property, but took a shortcut down by the ore bins to the road leading to Bingham where he had intended to meet Lawrence Singleton, a fellow workman who had invited deceased to ride home with him, and who was waiting for deceased at a point not far distant from where the fatal injury occurred. The route taken by deceased was used by but few of the employes in going home from work. The management was not aware that it was being used by any of them. The employes had not been forbidden to use this route."

Plaintiffs contend that the route supposed to have been taken by deceased in leaving his work was unauthorized, unsafe, more hazardous than the authorized route, and that therefore the accident did not arise out of or in the course of his employment. In order to determine this question it becomes necessary to describe, to the best of our understanding, the location of the company's property, and especially the features which tend to illustrate how the accident probably occurred. There being no eyewitnesses, we are compelled to rely solely upon the circumstances and conditions disclosed by the record.

Deceased lived in the town of Bingham about one mile below the property of the mining company, which is situated in what is known as "Carr's Fork." The general directions of Carr's Fork, which is a canyon, is northeast and southwest. At some points it bears almost directly east. There is a highway extending from the town of Bingham northeast-

erly through the company's property, and for some distance
beyond. The first point of interest, as far as concerns the
question here, is the company's mill situated near the south-
west end of the property. Approximately 100 feet east of
the mill is the checking office where the employees check in
before starting to work and check out when leaving. The
checking office is on the south side of the highway to which
we have referred, and the entrance to the company's mine
is on the north side directly opposite. Moving northeasterly
from this point for a distance of about 300 feet on a well-
traveled road which diverges from the main highway at the
checking office we reach the company's carpenter shop. A
railroad track used for carrying ore to the bins runs substan-
tially parallel with the traveled road, and is covered, more
or less, with snowsheds. There appears to be an opening
in the side or end of the snowsheds, and beyond that opening
there is a trail running by a tramway used for picking up
and saving ore that is dropped from the cars above. The ore
cars run on trestles to the top of the bins, and the tram-
way is several feet below. The trail referred to is connected
with stairways by means of which some of the employes,
especially those working in that vicinity, reach the main
highway leading down to Bingham. From the evidence be-
fore us we are unable to make a satisfactory pen picture of
this situation. A map prepared by the company's safety
engineer was admitted in evidence. It was called to the
attention of one of appellant's witnesses, who identified it
as being substantially correct. On the map appears all the
features of the company's premises to which we have re-
ferred. What the company claims as the usual and author-
ized ways of ingress and egress are marked in blue. The
route deceased was supposed to have taken on the occasion
of the accident is marked in red. A red cross is placed on
the tramway at the place where his body was found. The
witness to whom we have referred testified to finding the
body next day lying with its head down, both feet on the
cable, one of which was badly burned. This cable was used

Certiorari

to draw the skip on the tramway, and had become electrified by defective insulation. The witness' attention was called to the red lines on the map which indicated the supposed route deceased followed. After leaving the carpenter shop, as above stated, the red lines cross the tramway at or near its upper terminus and run along the east side and nearly parallel therewith for a distance of about 75 feet, where it ends on the tramway and where the red cross appears. Concerning these features the witness testified as follows:

"Q. I will ask you, Mr. Bannock, if you know whether there is a path leading alongside of this tramway? A. Well; I don't know how well a path there is, but there was a little path there. There was several went down that way.

"Q. Regularly? A. Why, every day there were some went down. I was working there, and would see them, but I never paid much attention how many went down.

"Q. How would they get to that point alongside the tramway? A. They would have to go out there through that door at the snowshed. * * *

"Q. Do you mean to say then the men would come out of the snowshed and under the trestle where the tramway is? A. Yes.

"Q. Did you say under the trestle or over? A. Under.

"Q. And then where does the path lead? A. Right straight down.

"Q. Under the trestle? A. The tramway.

"Q. And how far does that path lead with reference to where you say you found Mr. Titcomb's body? In other words, does the path lead farther down the trestle than the point where you found his body? A. No, sir.

"Q. From that point where does the path lead? A. Right across on the little platform there.

"Q. Then where? A. To the other stairway.

"Q. And where does that stairway lead? A. Down to the bottom, the ore bins.

"Q. Would that be down to the bottom of the canyon? A. Yes, sir.

"Q. Down to the main traveled roadway? A. Down to where the tracks are.

"Q. The tracks? The main railroad tracks in the bottom of the canyon? A. Yes, sir.

"Q. I believe you stated, Mr. Bannock, that you observed employes using this path alongside the tramway previous to the time when Mr. Titcomb was killed? A. Yes, a few went down that way; I don't know just how many; there were several went down there right along.

"Q. Would that be daily? A. Yes, sir; there would be some go down that way every day that way.

"Q. Do you know whether or not any official of the company ever told any of the employes not to take that path in leaving their work? A. No, sir, I do not.

"Q. Do you know who the foreman is about there who had charge of the workmen at that point, where they could observe men going up and down? A. Well; Mr. Hansen, I guess, is our boss out there.

"Q. Was he situated to he could see men travel that route? A. Yes, sir.

"Q. Do you know whether or not he had knowledge of men using that route? A. No, sir.

"Q. You don't know whether he did or not? A. No, sir.

"Q. Your work is at the head of the ore bins? A. Yes.

"Q. I think you said you didn't pay attention as to who it was going up and down there? A. No.

"Q. Do you know what men they were? A. Well; I guess some of the carpenters went down that way, and the blacksmith went down sometimes.

"Q. Were these carpenters and blacksmiths going down that way for the purpose of doing work there or to get off the property? A. No; going home."

Lawrence Singleton, employed by the company as a carpenter, and a witness for the company, testified to seeing deceased at quitting time shortly before the accident. He had been working that day in the carpenter shop and was going to the checking office to check out. His automobile was parked down at the bins, and he invited deceased to ride home with him. He left deceased at the carpenter shop to

go to the checking office, and thence went to his car down the main highway. Deceased that day had been working at the mill. He had gone from the mill to the carpenter shop to leave his tools. In going from the mill to the carpenter shop he would necessarily pass the checking office. Whether or not he checked out does not appear. It is highly probable he did, as he did not go back that way when he left for home. Singleton testified that from the carpenter shop to where he left his car, by way of the checking office, the distance was about 300 yards; that he waited for the deceased down opposite the bins, but that as deceased did not come he drove home. He further testified that when they worked at the mill the usual way was to come through the shed and check out, and then take the usual way out, sometimes through the snowshed. The witness described three ways of getting out—one was the way deceased was supposed to have gone. He, himself, had gone that way. It depended on where they were when they quit work. If they were down by the carpenter shop and did not have to check out they would go down past the tramway. Witness did that when he was in a hurry.

Joseph Norton, superintendent of the mining company, testified that it had never been called to his attention that employes were using the route deceased was supposed to have taken as a means of exit from the property; that he had never sanctioned or authorized that course as a means of exit from the carpenter shop, nor had he forbidden it; that men loading ore into the railroad cars below and men loading the skip and having to travel up the tramway had the right to go that way, as far as they were concerned. The testimony of this witness tended to show that the way deceased evidently went was more or less inconvenient, the stairways being steep and not directly connected. Other evidence tended to show that portions of the route were rough and uneven. There is nothing, however, as we read the record, that indicates any apparent danger or hazard in

traveling the route taken by deceased. That such route was followed frequently, in fact daily, by employees who worked in the vicinity of the tramway and ore bins is established by substantial evidence. The carpenter shop is only a matter of 50 or 60 feet from the tramway, and there appears to be an opening leading directly to it. This opening connects with a path or trail along the side of the tramway, and the trail connects with a platform and stairways all leading in the direction of the highway where Singleton's car was parked. Singleton fixes the distance from the carpenter shop to his car by way of the checking office as 300 yards. Singleton had to go that way in order to check out. The route deceased traveled if he had reached the car would have been about 100 yards. No doubt he would have reached the car with perfect safety had it not been for the unusual, unexpected condition of the cable—something which so far as the evidence shows, had never happened before, and which was not due to any fault of deceased. The electrification of the cable was due entirely to defective insulation.

It is an admitted fact that the miners who worked in the mine and who constituted the great majority of the employes used the main highway on leaving their work to go home, for the manifest reason that when they emerged from the mine they were near the checking office and all they had to do was to check out and go home. They were right on the highway leading down to Bingham, where they resided. This was also true as to the carpenters who worked in the carpenter shop. When a carpenter's day's work was done he deposited his tools in the carpenter shop where they belonged and then went to the checking office and checked out. At that point he, too, would be on the highway leading to his home. But the carpenter whose work was at the mill, in going to the carpenter shop to leave his tools, would pass through the checking office on his way. Then when he reached the carpenter shop and deposited his tools he was ready to leave the work for home.

The deceased was only 23 years of age at the time of his death.  He had been married to the applicant just eight days when the fatal accident occurred.  He had been working for the plaintiff mining company before his marriage and was arranging to furnish his wife a home in the town of Bingham, near his work.

The Utah Industrial Act allows compensation for injuries to employes, within the act, resulting from "accident arising out of or in the course of their employment."  The Utah statute is distinguishable from the statutes of other states and the English statute in that it allows compensation when the accident arises in the course of the employment whether it arises out of the employment or not.  It must be conceded that in most cases where an employe sustains an injury which is compensable both conditions will be found to exist. But it is conceivable that many accidents may occur in the course of employment which do not arise out of it.  This distinction has been recognized by this court in several cases heretofore decided.  *State Road Comm.* v. *Ind. Comm.*, 56 Utah, 252, 190 P. 544; *Twin Peaks Canning Co.* v. *Ind. Comm.*, 57 Utah, 589, 196 P. 853, 20 A. L. R. 872; *Cudahy Packing Co.* v. *Ind. Comm.*, 60 Utah, 161, 207 P. 148, 28 A. L. R. 1394.  An award of compensation in each of the cases above cited was sustained by this court on the theory that the accident arose in the course of employment.  In State Road Commission Case, supra, it was expressly held that the accident did not arise out of the employment, but did arise in the course of it.  In the other two cases the inference is almost conclusive to the same effect.

In a treatise recently published by Corpus Juris on "Workmen's Compensation Acts," the author at pages 72, 73, says:

"The expressions 'arising out of' and 'in the course of' the employment are not synonymous; but the words 'arising out of' are construed to refer to the origin or cause of the injury, and the work 'in the course of' to refer to the time, place, and circumstances under which it occurred. An injury which occurs in the course of the employ-

**546** **SUPREME COURT OF UTAH** [July

Utah Apex Mining Co. et al. v. Ind. Com. of Utah, 67 Utah 537.

ment will ordinarily, but not necessarily, arise out of it, while an injury arising out of an employment almost necessarily occurs in the course of it."

The definition of the terms referred to in the excerpt just quoted is about as concise as can be found in any of the authorities we have examined. As the statutes of nearly all the states require the fulfillment of both conditions before compensation is allowed, it is not to be expected that the courts in such jurisdictions would often find it necessary to differentiate between the two. Perhaps our own decisions to which we have referred furnish as sure a guide as can be found as to when, and in what circumstances the distinction should be applied.

In *Lancashire & Yorkshire Ry. Co.* v. *Highley,* 15 N. C. C. A. 210-293, a case cited by plaintiffs and much relied on, an employe of the railroad company was compelled to wait at a certain station for his train. He had his breakfast with him and concluded to eat it while waiting. He needed hot water to prepare his breakfast. There was a company messroom on the opposite side of the railroad tracks which usually furnished hot water to the company employes, when requested. There were three ways of reaching the messroom : The first and most direct way was by crossing several lines of rail, including main lines and sidings; the second was by a subway which avoided all the tracks but two; and the third was by going around and avoiding all. The first way was the shortest. The railroad rules did not prohibit its use. It was habitually used by acquiescence of the company. The employe took that route. He crossed the main line safely, and then came to the siding on which, as frequently happened, a freight train was standing. The siding was curved so that the engine could not be seen, and the employee thought it was a "dead train." It was usual to pass between the trucks of a standing train. The employee went between; the train moved; he was caught between the trucks and killed. On final appeal to the House of Lords,

by the railroad company, it was held the employe was not entitled to compensation because it did not appear that the accident arose out of *and* in the course of his employment. The discussion in the House of Lords is instructive and illuminating. The particular feature, however, to which we desire to call attention, in connection with what we have already said, is the expression of appellant's counsel in the beginning of their argument, and also an expression of Viscount Haldane, during the deliberation of the Lords. Appellant's counsel, at page 220 of the volume referred to, say:

"On the facts admitted or proved, the death of deceased was not caused by an accident arising out of his employment, although it happened in the course of the employment."

At page 243 of the same volume Viscount Haldane says:

"I think that in order to satisfy the words 'injury by accident arising out of and in the course of the employment,' the workman, or those claiming on his account, must show that two conditions have been satisfied. The injury by accident must have occurred as something which would not have occurred but for the circumstance of the employment and as having been something due to it—the employment—and it must further have occurred during its currency. As to the second of these conditions there appears to me to be no room for doubt that it was not fulfilled in the case before us. The real question which arises relates to the first condition."

If the English statute had been the same as the Utah statute the admission of appellants' counsel would have put appellants out of court and been conclusive in favor of respondent. Furthermore, from the mental attitude of Viscount Haldane, perhaps the brightest legal mind in the House of Lords, we might reasonably conclude that the final decision of the House of Lords would have been the reverse of what it was. We doubt if there is any better illustration of the distinction between the two conditions named in the statute than is found in the English case referred to. The employee was in the course of his employment when he undertook to go across the tracks to the messroom to prepare

his breakfast, but the origin or cause of his injury was not connected with his employment. This seems to be the distinction, and for failure to satisfy both conditions under the English statute compensation was denied.

It is an established rule in this jurisdiction, based upon a mandatory statute, that on writ of review to this court, in this class of cases, the court will not disturb the commission's findings if there is any substantial evidence to sustain them. Furthermore, the court will not review the evidence and pass upon its weight where there appears to be a substantial conflict. So that it is love's labor lost and time wasted for counsel, in their argument, to devote time and space in discussing evidence in conflict with the evidence upon which the award is based. Certain facts in this case are admitted. The deceased was an employe of the plaintiff mining company when the accident occurred which resulted in his death. His death occurred on the premises of his employer at a time when he was leaving for home at the end of his day's work. The above facts are not in dispute. The following facts are sustained by substantial evidence: He came to his death by means of an instrumentality of his employer over which he had no control and for the condition of which he was in no manner responsible. The condition of the cable was unusual, extraordinary, and not apparent. There is no evidence tending to show that the deceased deliberately and knowingly assumed any risk of danger when he came in contact with the cable. The purpose for which the cable was used did not involve the necessity of its being charged with electricity, and as far as the record discloses such a condition had never occurred before. Deceased's body was found on the tramway at the end of a path frequently traveled by employes of the company who worked in that vicinity. The carpenter shop where deceased left his tools, as was the custom of carpenters when their day's work was done, was within 60 or 75 feet of the tramway and 200 feet

of the company's ore bins at and about which several employes worked. The undisputed evidence shows that such employes were authorized to use the route taken by deceased on leaving their work for home. No orders had been given by the management limiting the use of this route to employes working on the tramway or about the ore bins. As far as orders were concerned the way was open equally to all of the employes of the company who might find it more convenient to go that way than around on the highway.

In these circumstances the question is: Is there any rule of law pertaining to industrial accidents arising under statutes similar to the Utah statute which makes it incumbent upon this court to hold that the deceased workman in the instant case was outside the course of his employment when the fatal accident occurred? It is not contended by plaintiffs that he stepped outside the course of his employment the moment he deposited his tools in the carpenter shop and started for home. The contention is that he took an unusual and hazardous route and one which was not sanctioned or acquiesced in by his employer. These propositions have been answered already in what has been said. There is evidence to show that the route was not unusual for employes working in that vicinity. It was not apparently hazardous and not hazardous at all except for the unusual condition of the cable, of which deceased was not aware and for which he was not responsible. As to the route being unauthorized by the company, the testimony of Norton, the superintendent of the company, while evidently intended to favor the company, cuts both ways like a two-edge sword. He admitted that employes working about the ore bins and along and on the tramway had the right to travel that route, thereby inferentially admitting that the route was not hazardous. Therefore the contention that it was hazardous is both inconsistent and disingenuous. If it was hazardous, why allow any employe to use it? Furthermore, if some of the employes, without express authority, had the right to use it, certainly

550        SUPREME COURT OF UTAH        [July

Utah Apex Mining Co. et al. v. Ind. Com. of Utah, 67 Utah 536.

other employes in the same vicinity, unless expressly forbidden, had the right to use, and in doing so could not be charged with stepping outside the course of their employment.

In addition to the English case to which we have referred, plaintiffs call our attention to the following: *Hills* v. *Blair*, 182 Mich. 20, 148 N. W. 243; *Urban* v. *Topping*, 184 App. Div. 633, 172 N. Y. S. 432; *Inland Steel Co.* v. *Lambert*, 66 Ind. App. 246, 118 N. E. 162; *Pritchard* v. *Torkington*, 7 B. W. C. C. 719; *Guastelo* v. *Mich. Cent. R. Co.*, 194 Mich. 382, 160 N. W. 484, L. R. A. 1917D, 69; *Mason* v. *Alexandre*, 96 Conn. 343, 113 A. 925; *Schweiss* v. *Ind. Comm.*, 292 Ill. 90, 126 N. E. 566; *McInerney* v. *B. & S. R. R.*, 225 N. Y. 130, 121 N. E. 806; *American Indemnity Co.* v. *Dinkins* (Tex. Civ. App.) 211 S. W. 949, 18 N. C. C. A. 1034 note; *Lumber Co.* v. *Ind. Comm.* (1918) 167 Wis. 337, 167 N. W. 453; *Ames* v. *New York Cent. R. Co.*, 178 App. Div. 324, 165 N. Y. S. 84; *Terminal Ry. Ass'n* v. *Ind. Comm.*, 309 Ill. 203, 140 N. E. 827; *Georgia Ry. & P. Co.* v. *Clore* (Ga. App.) 129 S. E. 799; *United Disposal Co.* v. *Ind. Comm.*, 291 Ill. 480, 126 N. E. 183; *Moore & Scott Iron Works* v. *Ind. Comm.*, 36 Cal. App. 582, 172 P. 1114; *Cudahy Packing Co.* v. *Ind. Comm.*, 60 Utah, 161, 207 P. 148, 28 A. L. R. 1394; *Utah Copper Co.* v. *Ind. Comm.*, 62 Utah, 33, 217 P. 1105, 33 A. L. R. 1327; *Babineau's Case* (Mass.) 150 N. E. 4.

The above-cited cases (with the exception of the two Utah cases) all arose under statutes patterned after the English statutes and statutes of practically all the other states of this country. They provide for compensation only when the accident "arises out of *and* in the course of employment."

As stated in the Cudahy Packing Company Case, supra, the Utah statute was first enacted in 1917 (Comp. Laws 1917, §§ 3061-3165), after the same pattern, but in the very next session, 1919 (Laws 1919, p. 158), the Legislature amended that feature of the act by substituting the word "or" for the word "and," thereby providing for compensation whenever

either condition was established. No doubt after two years' experience in operating the act the Legislature arrived at the conclusion that justice to employes and their dependents demanded a more liberal provision than was afforded by the statute of 1917. In any event, the Legislature recognized there was a substantial difference between the terms "arising out of" and "in the course of" and amended the statute accordingly. It is the duty of the court to give due effect to the evident purpose of the amendment. It may be conceded in the instant case that it is extremely doubtful if the accident in question arose out of deceased's employment. The "origin or cause of the injury" was separate and apart from deceased's employment. He had nothing whatever to do with the matter of insulation or with keeping the instrumentality in proper repair. That was the duty of the company, and belonged to another department of the company's business. But, as stated in effect in another connection, deceased was in the course of his employment in attempting to leave the premises of his employer when his day's work was finished, and his dependent is entitled to the protection which the statute affords unless deceased did something which took him out of the course of his employment.

In view of the substantial difference between the Utah statute and the statutes of the states under which the cases cited by plaintiffs arose, it would serve no useful purpose to review those cases in detail in the attempt to distinguish them from the case at bar. Of necessity all of them are cases in which the court found that the origin or cause of the injury was outside of the employe's employment and consequently was not in the course of it. Manifestly, such cases afforded little or no assistance to the court in determining the question presented here. The Utah Copper Company Case is cited by plaintiff and quoted from at considerable length. It should receive brief notice before concluding this opinion, because the case is evidently relied on in support of plaintiff's contention. In that case a fireman and brakeman on a little railroad operated by the plaintiff company ex-

changed places on a stormy day without the knowledge or consent of the company. In operating the train a collision occurred in which the employe acting as fireman was killed. Both the fireman and the brakeman were experienced employes in both capacities. Compensation was allowed by the commission. this court on writ of review annulled the award. It was a clear case of the employe leaving the work he was specially employed to do, and without the knowledge or consent of his employer engaging in another kind of work. In the opinion the following excerpt is quoted from Bradbury, Workmen's Compensation (2d Ed.) 459:

"Where a servant is employed to do a certain service and is injured in the performance of a different service voluntarily undertaken, the master is not held liable."

That states the case in a nutshell, but it is not in the least instructive upon the question before the court.

The Attorney General invites our attention to numerous cases from other jurisdictions. They, too, are cases arising under statutes different from our own, and like the cases cited by plaintiffs afford but little assistance to the court in the instant case. It may be said, however, that they are cases in which awards of compensation were sustained by the courts and fairly meet the cases relied on by the plaintiffs. That there is a sharp conflict among the authorities on conditions quite analogous is clearly shown from the briefs of opposing counsel.

Defendants, however, refer to the "Roberts Case," 124 Me. 129, 126 A. 573, and quote therefrom the following excerpt, which tersely expresses our conception of the rule that should be adopted under the Utah statute in cases of this kind.

" 'The course of his employment' does not begin and end with the actual work he was employed to do, but covers the period between his entering his employer's premises a reasonable time before beginning his actual work, and his leaving the premises within a reasonable time after his day's work is done, and during the usual lunch hour, he

being in any place where he may reasonably be in connection with his duties or entering or leaving the premises by any way he may reasonably select."—citing cases.

The language above quoted from the Roberts Case is not more liberal in favor of employes than is the Utah statute, as it was amended in 1919. It was not only amended by substituting the word "or" for the word "and," as hereinbefore stated, but the following significant words were added, "wheresoever such injury has occurred." See Sess. Laws Utah 1919, p. 158.

The Roberts Case, supra, on the same page from which we have quoted, refers expressly to the Utah statute and recognizes the far-reaching effect of the difference between it and the statutes of other jurisdictions. It refers to the Cudahy Case, supra, as an example.

The court is of opinion that the time, place, circumstances, and death of the deceased employe were all within the course of his employment.

The award of the commission is affirmed.

GIDEON, C. J., and FRICK, CHERRY, and STRAUP, JJ., concur.