## TEXAS EMPLOYERS' INS. ASS'N v. ANDERSON et al.

### No. 12539.

Court of Civil Appeals of Texas. Dallas.

Jan. 14, 1939.

Rehearing Denied March 4, 1939.

Ramey, Calhoun & Marsh and Joe W. Sheehy, all of Tyler, and Wynne & Wynne, of Wills Point, for appellant.

West & Stanford, of Canton, and Nat M. Crawford, of Grand Saline, for appellees.

LOONEY, Justice.

Appellant, Texas Employers' Insurance Association (the insurance carrier), instituted this suit against Mrs. May Anderson (widow), Charles Anderson, and Mildred Anderson (children), statutory beneficiaries of C. C. Anderson, deceased, to set aside a final award of the Industrial Accident Board in their favor, on account of the death of the husband and father, alleged to have resulted from accidental injuries received in the course of his employment with Morton Salt Company, of Grand Saline, Texas.

Appellees, defendants below, answered the suit and in a cross action, sought to recover the benefits in their favor, as authorized by the Workmen's Compensation Law (Vernon's Ann.Civ.St. art. 8306 et seq.). Issue was joined on the allegations of the cross action, but by an agreement all controverted issues were effectually eliminated, except the question, whether, within the meaning of the Workmen's Compensation Law, C. C. Anderson was fatally injured in the course of his employment. That issue having been answered by the jury in the affirmative, and as we think with ample evidence to sustain the finding, the court rendered judgment in favor of appellees, to which appellant excepted, gave notice of and perfected this appeal.

In view of the situation produced by the agreement, the discussion will be restricted alone, to the question, which, as stated by appellant in its brief (at pages 14, 15), is "whether or not C. C. Anderson was in

the course of his employment with Morton Salt Company within the purview and meaning of the Workmen's Compensation Act of the State of Texas at the time he received the injuries resulting in his death".

The material facts bearing upon that issue are these: The Texas & Pacific Railroad, consisting of a main line and several sidings, extends east and west through the premises of Morton Salt Company in the town of Grand Saline; the lands owned and controlled by the Salt Company adjoin the right of way of the railroad both on the north and on the south; on the north, the Company's buildings are located, consisting of a large main building, machine shop, cooker shop, boiler and granary room, office, etc. The granary room, in which the deceased worked, was located about 130 feet north of the main line of the railroad; from the granary a footpath extended south to the north line of the right of way of the railroad. On the south side of the right of way, across from the Company's buildings, a number of oil tanks and warehouses, owned by oil companies, were located. The Salt Company controlled and used several acres of land adjoining the right of way of the railroad on the south side, across from the Company's buildings just mentioned, upon which it maintained several brine wells, a derrick, a brine tank about 100 x 150 feet in size, a sewer, connected with the plant to carry off waste water, a pump house and an area called "waste land", on which waste brine from the brine pool was run. There also existed a trail or footpath through this acreage, winding in a northerly direction, crossing a ravine that was bridged, leading to a point on the railroad right of way south of the granary room and in line with the footpath leading south from the granary room to the right of way before mentioned.

The deceased had been an employe of the Salt Company for over twenty years and, during that entire time, in going to and from his work, had customarily walked the footpath on both sides of the railroad and crossed over the right of way at substantially the same place where he was injured. He resided about a quarter of a mile south, a little west of the building in which he worked; occupied a tenant house belonging to J. S. Land, master mechanic of the Salt Company, and deceased's foreman, and in the same vicinity a number of other employes of the Salt Company resided, some of whom occupied Company owned houses, all of whom, in like manner, customarily traveled the footpath and crossed over the railroad tracks in going to and from their work at the Company's plant. The pathway was used exclusively by pedestrians, but, being unfenced, was occasionally used by persons other than Company employes.

Deceased was an operator in the granary room, worked on a night shift, customarily relieving his predecessor between 3 and 4 o'clock in the afternoon and was in turn relieved by a successor, between 11 and 12 o'clock at night. On the night of the fatal accident, being relieved about 11:30, deceased checked out and was seen leaving the granary room, on the footpath going south in the direction of his home, and within about ten or fifteen minutes was found by persons attracted by his outcry, on his hands and knees in the path between granary room and the main line of the railroad. In answer to an inquiry, stated that he had attempted to crawl under a freight car, was caught and his legs cut off. Blood and particles of flesh and bone were found on the south rail of the main line track, and at that point, deceased's dinner-pail, walking stick, and flashlight were also found, indicating clearly that, in crawling under the car, he had reached the south rail when the train, of which the car was a part, was put in motion resulting in the accident. The fact that deceased was found north of the tracks clearly indicates that, after being wounded, he crawled back over the main line and sidings and onto the pathway leading to the granary room, calling for help. His death occurred about ten days later.

There are two other routes that deceased and other employes residing in that vicinity could have traveled to and from the Salt Company's plant, however, these were circuitous, out of the way, also crossed the railroad tracks, and about twice the distance of the pathway, the latter being the shortest, safest, most direct and practicable route from the residence of the deceased to the granary where he worked. Its use as a means of ingress to and exit from his place of work not only conduced to his safety and convenience, but contributed to the promptness and efficiency with which he was enabled to discharge the duties owing his employer; hence the reason and necessity for his presence upon the railroad track (that portion of the pathway leading over the railroad right of way) when injured, in our opinion, had to do with, originated in and grew out of the work of the employer; and that, the injury

received at the time, place, and under the circumstances, necessarily was in furtherance of the affairs or business of the employer. Evidently, this was realized by the Salt Company, or else the pathway through its premises, which, as disclosed by the record, had been in existence and used daily by the deceased and other employes for over twenty years, would not have been permitted to remain open and subject to such a continuous use.

While it was not a prerequisite to recovery by appellees that the injury to deceased should have been sustained on the premises of the employer, yet, in view of the undisputed facts and circumstances, we think it should be so regarded. The Salt Company controlled the land adjacent to the right of way of the railroad on both sides, and its employes, in using the pathway through the premises, in going to and from their work, customarily and necessarily passed over the right of way and tracks of the railroad, without objection by the railroad company, so far as disclosed by the record; hence, we think it may reasonably be assumed that such use was with its permission, and that for the purposes of this case, it may correctly be said that the deceased was injured at a place intended for use as a means of ingress and egress to and from his place of work, and that his departure was so recent and closely connected with the employment as to render it an incident thereto. Neither was it necessary, in our opinion, that the accident should have occurred during the hours of actual service; nor that deceased should have been discharging some specific duty required by his employment at the time of the injury.

These views are fully sustained by the authorities, to the effect, that, as a general rule accidents which happen to an employe on his way to and from work are not regarded as in the course of his employment, except while he is at or so near the place of employment as reasonably to be regarded as in effect at the place; or where, if not on the employer's premises, he is at or near the place of work and on a road or other way intended by the contract of employment as being the means of access to the work. In Petroleum Casualty Co. v. Green, Tex.Civ.App., 11 S.W.2d 388, 390, writ refused, Judge Gallagher, speaking for the Waco Court, in a well considered compensation case, announced the doctrine, that "It was not necessary that the injury complained of by appellee should have been sustained during the hours of actual service

which he was required by the terms of his employment to render to said company. The course of his employment was not limited to the exact moment when he reported for duty at the camp that morning, nor to the moment when his labors for the day were completed. It necessarily included reasonable time thereafter to return from said camp to the highway in the usual and customary manner" (citing authorities); and that, "the leaving of the premises where appellee was employed was so closely connected with his employment as to render it a necessary incident thereto. Wabash Railway Co. v. Industrial Commission, supra (294 Ill. 119), page 293 of 128 N. E."

The case of Cudahy Packing Co. v. Parramore, 263 U.S. 418, 44 S.Ct. 153, 154, 155, 68 L.Ed. 366, 30 A.L.R. 532, is analogous to the case at bar, and arose under the Workmen's Compensation Law of the State of Utah. Parramore, the employe, resided six miles from the plant of his employer; the only practicable way of ingress and egress customarily traveled by the employes was along a road and across railroad tracks; in passing over the railroad, the automobile in which he rode was struck by an engine on the railroad and he was killed. The court held that liability existed, and, among other things, used the following pertinent language: "We attach no importance to the fact that the accident happened a few minutes before the time Parramore was to begin work, and was therefore, to that extent, outside the specified hours of employment. The employment contemplated his entry upon and departure from the premises as much as it contemplated his working there, and must include a reasonable interval of time for that purpose". (Citing authorities.) The above authorities were cited and liberal quotations therefrom made by Judge Sharp, in Federal Surety Co. v. Ragle, Tex.Com.App., 40 S.W.2d 63, 64. In Payne v. Wall, 1921, 76 Ind.App. 634, 132 N.E. 707, 708, 49 A.L.R. 427, it was said that: "A servant's employment is not limited 'to the exact moment when the workman reaches the place where he is to begin his work, or to the moment when he ceases that work. It necessarily includes a reasonable amount of time and space before and after ceasing actual employment, having in mind all the circumstances connected with the accident. Whether an employee, in going to or returning from the place of his employment, is in the line of his employment, is governed and controlled by the particular cir-

cumstances and facts of each case. There must, however, be a line beyond which the liability of the employer cannot continue. Where that line is to be drawn is usually a question of fact.'"

In administering the Workmen's Compensation Law, doubtless the greatest difficulty is encountered in determining whether, in a particular case, the employe sustained personal injuries in the course of his employment. We are without a formula except the statute, which being phrased in general terms, each case necessarily must be determined on its own peculiar facts, and as a question of fact. As we have just seen, it was not a necessary prerequisite to a recovery by appellees that deceased should have sustained the injury causing death while on the premises of his employer, nor was it necessary that the accident should have occurred during the hours of actual service, nor that the deceased, at the time of being injured, should have been engaged in the discharge of any specific duty incident to his employment. The statute (Art. 8309, § 1, subdiv. 4, Workmen's Compensation Law), after excepting injuries caused by an act of God, an act of a third person, those received while intoxicated and those wilfully self-inflicted, reads: "but shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employé while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

Although the meaning of the statute is somewhat elusive, yet the comprehensive terms employed indicate that it has an expansive meaning and that, without regard to where, when or how the employe is injured, compensation is due, provided the injury results from a risk or hazard that the employe assumes in order to perform his master's task.

In Lumberman's Reciprocal Ass'n v. Behnken et al., 112 Tex. 103, 246 S.W. 72, 73, 28 A.L.R. 1402, Judge Greenwood, speaking for the Supreme Court, said: "An injury has to do with, and arises out of, the work or business of the employer, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent in or incident to the conduct of such work or business. As tersely put by the Supreme Court of Iowa: 'What the law intends is to protect the employe against the risk or hazard taken in order to perform the master's task.'—Pace v. Appanoose County, 184 Iowa 498, 168 N.W. [916] 918. Though injuries arising from risks incidental to employment most frequently occur during hours of active labor and on premises within the control of the employer, yet they are not always so circumscribed either as to time or place. * * * Our statute declares that it is not necessary to fix liability that the injury be sustained on the employer's premises." In the opinion, Judge Greenwood cited and made liberal quotations from two cases very much in point, one, Judson Mfg. Co. et al. v. Industrial Accident Comm. et al., 181 Cal. 300, 184 P. 1, from the Supreme Court of California. "There one Gallia was struck and killed by an engine operated by the Southern Pacific Company on a crossing over that company's tracks in San Francisco, which crossing was the authorized means of access to the factory of Gallia's employer, the Judson Manufacturing Company. Gallia was on the way to his work. He was injured about 20 feet outside the factory gate, and about five minutes before the time for him to begin active work. It was essential to liability under the California act that Gallia, when injured was 'performing service growing out of and incidental to his employment,' and was 'acting within the course of his employment.' In declaring that compensation should be made under the act for Gallia's death, the Supreme Court of California said: 'It seems to us, however, that when an employee has arrived at the premises of his employer, and is thereon for the purpose of immediately commencing his actual work, he is performing service incidental to his employment. The facts stated above show that as between the employer and his employees the path across the Southern Pacific Company's right of way was in fact a part of the employer's plant, and that at the time of his death Gallia was there solely in the line of his duty as an employee. It would be a harsh and indefensible rule that would withhold compensation from an employee engaged in traversing a dangerous pathway in his employer's building on his way to his own particular place of work therein, on the ground that he had not yet entered upon the real work of his employment. We can perceive no difference in principle between such a case and the case at bar.'" The other is the case of Procaccino v. E. Horton & Sons et al., by the Supreme Court of Errors of Connecticut, 95 Conn. 408, 111 A.

594, 595, 596. The court said: "We hold that the decedent at the time of his injury was using a way of approach over private property from a highway to the defendant's plant, which way of approach the defendants, in their employment of decedent, contemplated that he should use, and that the decedent in such use of the way was, after he left the highway, in the course of his employment, and that the injury arose out of a danger incident to his employment." The court had previously said: "When this employee, under the facts found, entered upon the private property lying between Main street and the defendants' plant, he came within the zone of his employment, and all dangers and perils incident to the use of this method of approach were perils incident to and arising out of his employment." Another case in point is Utah Apex Mining Co. et al. v. Industrial Commission of Utah et al., 67 Utah 537, 248 P. 490, 49 A.L.R. 415, by the Supreme Court of Utah, holding that: An employe's death occurs in the course of his employment within the meaning of the Workmen's Compensation Act, when it is caused by coming in contact with a cable which, without his knowledge, has accidentally become charged with electricity, although he is traveling a little-used path from his working place to the highway after quitting work for the day, the use of which by him had never been sanctioned by his employer, although others were permitted to use it, if its use by him had not been forbidden, and it was more convenient for him than the one regularly provided. Also the case of Benoit Coal Mining Co. et al. v. Moore, et al., 215. Ala. 220, 109 So. 878, by the Supreme Court of Alabama, holding that: in an action, under the Workmen's Compensation Act (Code 1923, §§ 7534–7597), for death of employe, evidence held to support finding that employe was killed while on way to working place with knowledge of defendant's superintendent, who made no objection to particular route followed, and that accident arose out of and in the course of employment, under section 7534.

If it be said that, as against the railroad company, Anderson was a trespasser upon its track at the time he was injured, yet, the employer having acquiesced in such trespass by its employes (if it was a trespass), liability under the Compensation Law could not be avoided by reason of that fact. As said by the Supreme Court of the United States, in Bountiful Brick Co. et al. v. Giles et al., 276 U.S. 154, 48 S.Ct. 221, 72 L.Ed. 507, 66 A.L.R. 1402, that arose under the Workmen's Compensation Act of Utah, that liability for an injury to an employe by a railroad train while on his way to work could not be avoided by the fact that the employe was a trespasser on the railroad track, if the employer (as in the instant case) consents to the trespass.

For other typical cases in point, involving injuries sustained by employes traveling on the usual and customary way of ingress to and exit from the employer's premises not used by the general public, as in the instant case held compensable, see Texas Employers', etc., Ass'n. v. Thomas, Tex.Civ. App., 283 S.W. 240 (writ refused); Petroleum Casualty Co. v. Green, Tex.Civ. App., 11 S.W.2d 388; Employers' Liability Assur. Corporation v. Light et al., Tex.Civ. App., 275 S.W. 685; Texas Employers' Ins. Ass'n v. Gill, Tex.Civ.App., 252 S.W. 850.

As deceased was injured while traveling a private pathway through the premises of the employer, used by its employes as a way of ingress to and exit from the place where they worked, the case, in our opinion, is ruled by the doctrine of the authorities just cited. It is perfectly obvious, we think, that the cases cited by appellant, involving injuries sustained upon public streets or highways, were ruled by an entirely different principle. This was clearly developed by Judge Greenwood in Lumberman's Recp. Ass'n v. Behnken, supra, in distinguishing that case from the case of American Indemnity Co. v. Dinkins, Tex.Civ. App., 211 S.W. 949, 954, where recovery was denied on the ground that the employe was injured upon a public highway, from a hazard to which each member of the public traveling the highway was exposed. Judge Greenwood said: "Dinkins received his injury in a collision with an automobile. He was returning from work. The automobile was driven by a coemployee returning to work. The collision occurred on one of the public streets of Beaumont, three-fourths of a mile from the employer's plant. * * * Dinkins' right to use the street was not derived from his employment. The injury occurred at a place provided by the city for public use, and not at a place furnished by Dinkins' employer, as a special mode of access to his work. The danger to Dinkins was one to which each member of the public was alike exposed. He was himself as much exposed to the danger when traversing the street on purely private business as when hurt. Dinkins' injury did not result from risk or hazard incident

to the conduct of his employer's business. His injury did not arise out of the business. That conclusion accords with the weight of authority, American and British, as do our conclusions herein." (Citing authorities.) And to the same effect, in Smith v. Texas Employers' Ins. Assn., 129 Tex. 573, 105 S.W.2d 192, 193, involving a highway injury, Judge German, after announcing the general rule to the effect that, injuries to an employe sustained while going to or returning from the place of employment, were not compensable, citing authorities, said: "This conclusion is based on the premise that one injured upon the streets or highways while going to or from his work suffers his injury as a consequence of risks and hazards of the streets and highways to which all members of the public are alike subject, and not as a consequence of risks and hazards having 'to do with and originating in the work, business, trade or profession of the employer.'" Hence, we think it perfectly obvious that, the underlying reason for the holdings in the Dinkins, Smith and other cases involving highway injuries, does not exist in a case such as the one at bar, involving an injury sustained by an employe while traveling a private way to and from his place of work not usually and customarily traveled by the public.

However, in the Smith case, supra, Judge German also announced arguendo a doctrine that we think pertinent, and applicable to the case at bar. He said: "The statute clearly implies, as has frequently been held, that the injury has to do with and originates in the employment when such injury is the result of some peril, risk, or hazard inherent in or incident to the conduct of the work or business"; in other words, the language of Judge German implies that, if in view of the nature of the employment, the conditions under which the employe is required to work, including the means afforded for access to and exit from the premises of the employer, the injury sustained could have been foreseen, it is compensable under the Workmen's Compensation Law. And this would be true, notwithstanding the injury would not have occurred but for the negligence of the employe, or his failure to observe the warning of his foreman. In the instant case, Mr. Land, master mechanic of the Salt Company, deceased's foreman, testified, in substance, that he knew it was the custom of Mr. Anderson to crawl under freight cars that happened to block the pathway and had repeatedly cautioned him of the danger of such an undertaking. The deceased having sustained the fatal injury from the very hazard of which he had been forewarned by his foreman, the conclusion is inescapable that, such a result not only should have been foreseen but, in fact, was foreseen, hence arose out of and was a consequence of the employment.

Being of opinion that reversible error has not been shown, the judgment of the trial court is affirmed.

Affirmed.

BOND, Chief Justice (dissenting).

From the majority opinion, there seems to be some confusion as to the location of the pathway mentioned in the record. There was no pathway leading over the railroad right of way and through the premises of the Morton Salt Company where Mr. Anderson received his fatal injury. The pathway mentioned leads from the vicinity of Mr. Anderson's home, across a broad area of territory to a public road south of the right of way leading east to the business section of Grand Saline. There is nothing in the record to suggest that the Salt Company controlled the land adjacent to the right of way on the south side of the railroad immediately opposite its salt plant, but, on the contrary, the evidence is uncontradicted that, opposite the plant on the south side of the railroad, industrial enterprises—the Gulf, Sinclair and other oil companies—used the land and had a road leading from their oil houses and tank batteries east to the town of Grand Saline. Into this roadway the pathway stopped.

Visualizing the scene, photographs accompany the record, which clearly show that no pathway leads over the right of way where the injury occurred; and, so far as this record reveals, the pathway mentioned in evidence has no bearing on the question of liability, or a basis for the assumption that the Salt Company intended its use as a means of ingress and egress to and from its place of business.

Mr. Anderson's right to use the railroad right of way was not derived from his employment. The Salt Company had no vested right in the right of way, and his employment did not require him to cross the railroad to go to his home. Obviously, his employer had no right to direct his course of travel after leaving its place of business; his employer had no control, and exercised none, over the railroad's right of way or of Mr. Anderson's right to its use. The

right of way belonged to the Texas & Pacific Railroad Company, and being within the city limits, it was unfenced and used by the general public, with, at least, tacit consent of the Railroad Company. Thus, the injury to Mr. Anderson occurred at a place where the general public was subjected to the same hazards as the employes of the Salt Company, and not a place furnished by Anderson's employer as a special mode of access to his work. His injury certainly did not result from risk or hazard incident to the conduct of his employer's business; did not arise out of his employment. It was undisputably shown that the deceased was on his way home for no purpose connected with his employment, but solely for purposes of his own—to rest, sleep, and eat.

It is obvious that Mr. Anderson's injuries happened at a time when he was off duty for his employer; that he was not on his employer's premises or on any pathway or entrance to his employer's place of business; that he was not required by his employment to cross the railroad to go home, which was his destination at the time of his injuries; that he was doing nothing in furtherance of his employer's business or in performance of any work or errand for his employer; that he followed his own desires and inclination and was injured in a place that was used by the public generally, thus subjecting himself voluntarily, and over the express warnings of the foreman of his employer's salt plant, to the risks and hazards incident to the use of a public thoroughfare. The risks and hazards the employe voluntarily assumed in crossing the railroad were evidently outside of the risks and hazards incident to his work for his employer, and for which the compensation insurance policy was not issued and the Workmen's Compensation Act not intended to cover.

In the case of Banks v. Commercial Standard Ins. Co., 78 S.W.2d 660, 662, writ dismissed, this court said: "It may be conceded that Banks received his injuries because of the fact that he was employed by the Wyatt Metal & Boiler Works, would not have been at the place or in the vicinity of the occurrence and would not have been injured had it not been for such employment, therefore, the injury originated in the work, yet, such injury under the statute is not compensable. It must be shown that it was received by the employee while engaged in the work or business of the employer, and resulted from a risk or hazard which was necessary or ordinary or reasonably inherent in or incident to the conduct of such work or business. Lumberman's Reciprocal Ass'n v. Behnken, supra [112 Tex. 103, 246 S.W. 72, 73, 28 A.L.R. 1402]; American Ind. Co. v. Dinkins [Tex.Civ. App.] supra [211 S.W. 949, 954]; London G. & A. Co. v. Smith (Tex.Civ.App.) 290 S.W. 774; Texas Employers' Ins. Ass'n. v. Smith, 75 S.W.2d 732, opinion of this Court of September 29, 1934."

In Smith v. Texas Employers' Ins. Ass'n, 129 Tex. 573, 105 S.W.2d 192; also, in American Indemnity Co. v. Dinkins, Tex. Civ.App., 211 S.W. 949, 954, the courts had occasion to consider cognate questions. There, the argument was advanced as here. In the Smith case, opinion adopted by our Supreme Court, Judge German said: "It appears to be the settled rule that even though the contract of employment contemplates that the employee, while engaged generally in the performance of his duties, may be subjected to the perils and hazards of the streets and highways, nevertheless in order that an injury resulting from the risks of the streets may be compensable, the employee, at the time of the injury, must be actually engaged in the performance of some particular duty of his employment, or must be upon some substantial mission of his employer in the course of his employment, which subjects him to such perils." [129 Tex. 573, 105 S.W.2d 194.]

It will serve no useful purpose to extend my views beyond that which has so often been decided by the courts of this state. It is clear the injury suffered resulting in death to Mr. Anderson is not compensable under the Workmen's Compensation Laws of Texas; therefore, for the reasons stated, the judgment of the trial court should be reversed and here rendered for appellee.

### On Rehearing.

LOONEY, Justice.

In so far as the correctness of the conclusion of the majority as to the law is challenged, the criticisms will not be answered, because, obviously, the opinion in that respect is its own defense; but wherein our conclusions of fact are challenged, as being against the undisputed evidence, the criticisms will be answered by the record.

In the original opinion, among other things, we said that "The lands owned and controlled by the Salt Company adjoin the

right of way of the railroad both on the north and on the south". The meaning of this, as disclosed by the record, is that the lands either owned or controlled by the Salt Company adjoin the right of way of the railroad both on the north and on the south. No contention is made by appellant that the land north of the railroad, owned by the Salt Company, does not adjoin the right of way.

With reference to the conclusion of fact above quoted, appellant, in paragraph 21 of its motion for rehearing (which, in its scope and meaning, also includes the same matters complained of in paragraphs 20, 22, 23 and 36), says: "The Court of Civil Appeals, as evidenced by the majority opinion, erred in holding or finding that lands owned and controlled by the Salt Company adjoin the right of way of the railroad both on the north and on the south, there being no evidence that the Morton Salt Company either owned or controlled the lands adjoining the right of way of the Texas & Pacific Railroad Company on the south. On the other hand, the undisputed evidence shows that the Morton Salt Company did not own or control the land adjoining the right of way of said railroad on the south, the undisputed evidence showing that the land or property immediately adjacent to the right of way of said railroad company on the south was owned and/or controlled by several oil companies, including Gulf, Sinclair, Texaco, and other companies, each of said oil companies maintaining and controlling its respective warehouses and storage tanks located on the property adjoining said railroad right of way on the south, and the undisputed evidence further shows that immediately south of said oil companies' warehouses and storage tanks there is located a public street or road running east and west."

The real contention, reduced to its last analysis and stripped of all surplusages, is, that, the acreage property south of the railroad held by the Salt Company under lease, occupied and controlled by it, traversed by the pathway that was traveled by Anderson and other employes of the company, in going to and from their work, did not immediately adjoin the right of way of the railroad, but there intervened between the right of way and this acreage property lands controlled by several oil companies and other industries, and that immediately south of this industrial property there was located a public street or road running east and west.

While we do not regard the matter of any materiality whether the footpath, traveled by the deceased and other employes of the Salt Company, passed immediately from said acreage onto the railroad right of way, or passed immediately onto and across the vehicular road, and lands owned by certain industries, before reaching the right of way; in that, the pathway, nevertheless, was the same, and its use by the employes was the same, and the situation, in either event, evoked the same rules of law. However, for the sake of being accurate, we will support our conclusion of fact by excerpts from the record.

Mr. J. S. Land, in the service of the Salt Company for thirty-three years, and, at the time, its master mechanic, speaking of the industries located south of the railroad, did not say they were south of the right of way, but did say that "they are just lined up and on the south side of the right of way". (P. 40, S. F.) With reference to the vehicular roadway running east and west located south of the oil tanks and other industries, was asked and answered: "Well, just for the purpose of your testimony it (the road) is on the south side of the railway, the Texas & Pacific right of way?" The witness answered, "Yes, sir." (P. 44, S. F.) Again, the witness was asked and answered:

"Q. Now, Mr. Land, in order to make the matter clear that we were talking about —I am not sure that anybody understood awhile ago. The roadway south of the Texas & Pacific tracks and the Gulf, Magnolia, Sinclair, The Texas Company, and the stock pens and the cotton platform is all south of the right of way? A. Yes, sir, south of the right of way—that is, south of the track. They are all on the right of way, but south of the tracks.

"Q. Then the roadway that we were speaking of awhile ago is immediately south of those buildings and tanks; the industrial switch that comes down there of the T. & P. just about divides that roadway in half? A. Yes, sir.

"Q. There is a part of it, south of it, and a part of it, north of it? A. Yes, sir."

The testimony quoted by appellant at pages 27 and 28 of its motion is to the same effect, that is, referred to the location of the roadway and the industries as being on the south side of the right of way. Besides, photographs 8, page 84, and 10, page 86, statement of facts, represent the same objects, that is, oil tanks and buildings of the Gulf Refining Company; one taken from

the north side looking south, the other from the south looking north, together show that the objects are located between and ·adjacent to railroad tracks; these photographs, considered in connection with the testimony of the witnesses, leave no doubt that the industries in question are located on the south side of the railroad right of way, hence it is shown that our conclusion is sustained by "undisputed evidence", rather than being against the "undisputed evidence", as contended by appellant.

In: the original 'opinion, among other things, we said that there were two other routes that the deceased and other employes residing in the same vicinity could have traveled to and from their place of work, but that the other routes were circuitous, also crossed the railroad tracks, about twice the distance of the pathway, the latter being the shortest, safest, most direct and practical route from the residence of the deceased to the granary room where he worked, and that its use not only conduced to his safety and convenience, but contributed to the promptness and efficiency with which he was able to discharge his duties, etc.

In paragraph 26, appellant says: "The Court of Civil Appeals, as evidenced by the majority opinion, erred in holding or finding that the two other routes that deceased, C. C. Anderson, could have traveled in going from his work to home other than the route he apparently was traveling at the time of his fatal injuries were about twice the distance of the route deceased apparently was following at the time of his fatal injuries, because there is no evidence showing that said two other routes or either of them were twice the distance of the route C. C. Anderson apparently was traveling at the time of his fatal injuries".

The evidence bearing upon the question raised in paragraph 26, as revealed by the record, is as follows: After mentioning the two routes, other than the pathway customarily traveled by Mr. Anderson to and from his work, Mr. Land, being questioned as to the relative distance to be traveled by these routes, was asked and answered the following:

"Q. Well, it would be some nearer from any point in the plant, the trailway would be? A. It might be some nearer, yes, sir. I don't know just how far from the point where he checked out.

"Q. All right, from the point where he left the Morton Salt Company grounds, from that point to Mr. Anderson's house, the trail is much the nearer way to his home? A. That is the nearer way, that's right."

Mr. J. W. Bateman, a surveyor well-acquainted with the premises, was asked and answered as follows:

"Q. Now, which of those (speaking of the different routes), in your opinion and from observing there on the ground, is the nearer way? A. Well, the trailway is much nearer from Mr. Anderson's house.

"Q. The trailway is much nearer from Mr. Anderson's house? A. Through to the salt plant.

"Q. Mr. Bateman, if you traveled around either of the ways you have designated other than the trailway would you or not cross the same number of railways? A. Practically the same in traveling around down to Main Street and back on west. You would cross the Short Line that goes to the salt mine, and also the line that goes to Van, besides the Pacific tracks."

Mrs. May Anderson, widow of the deceased, familiar with the premises, having traveled the pathway often, was asked and answered:

"Q. Does this trail you are talking about coming from your house in a northerly direction, does that trail intersect this roadway south of the right of way that you are talking about? (The road running east and west.) A. Yes, sir.

"Q. Does it come into it? A. Yes sir.

"Q. Now, at that point, Mrs. Anderson, if you go from that point to the Salt Company plant, how would you travel in the most direct way? A. You would travel north, go right through all those oil houses and across the main tracks of the T. & P.

"Q. Across the main tracks of the T. & P.? A. Yes Sir.

"Q. And then onto the Morton Salt Company grounds, is that correct? A. Yes Sir."

At another place in her testimony, she was asked and answered:

"Q. Which of the three ways that you have outlined, Mrs. Anderson, that you might travel from your home to the Morton Salt Company, is the nearer or shorter? A. Oh, the path is more direct way than any way.

"Q. The trailway? A. Yes Sir.

"Q. Have you any idea—can you give an estimate of approximately how much nearer the trailway would be than either of the others? A. Oh, I would say either way

would be probably a quarter of a mile farther.

"Q. A quarter of a mile more than the trailway? A. Yes sir."

A. L. Williams, nightwatchman for the Salt Company, well acquainted with the premises, was asked and answered:

"Q. Now, do you know approximately how far it is from the Salt Company plant across to where Mr. Anderson lived at that time? A. Well, I would say possibly a quarter of a mile". After mentioning the other routes from the salt plant to Anderson's home, this witness was asked and answered as follows: "Q. Was that as near as the route directly from the Morton Salt Company along the path to his house? A. No, sir".

Foster Land, fireman, with the Salt Company 20 years, well acquainted with the premises, was asked and answered:

"Q. Where does that trail go and in what direction? A. It goes south (referring to the trail under consideration).

"Q. Do you know where Mr. Anderson lived at the time he got hurt? A. Yes sir.

"Q. What direction was this trail leading with reference to—in other words, with reference to Mr. Anderson's house, where was this trail leading? A. It led to the salt mine.

"Q. All right, now, how far was it from the salt plant to where Mr. Anderson was living at that time? A. Well, I couldn't say just exactly. It was a quarter of a mile, I guess, or something like that".

At another place, the witness was asked and answered:

"Q. What is the most direct route from the Morton Salt Company's plant to Mr. Anderson's house? A. Well, I would say the way he was going there, was.

"Q. The trailway? A. Yes, sir.

"Q. Was there any other way one could go from the plant where he was working that night to his home, that was as near or direct a route? A. No, sir. I wouldn't think so."

This testimony shows that the trail was the shortest of the three routes; Mrs. Anderson testified that it was a quarter of a mile shorter; the last witness, Mr. Foster Land, testified that the route by the trail to Anderson's house was a quarter of a mile in distance; there being no evidence to the contrary, our conclusion to the effect that the other routes (or either) were twice the distance of the pathway, is supported by uncontradicted evidence, rather than being unsupported by any evidence, as alleged by appellant in paragraph No. 26 of its motion.

Our conclusions, challenged in paragraphs Nos. 27, 28, 29, 30, 31, 32, 33, 34, 35, 37, 38, 39, 50, 55, 56, and 59 of appellant's motion, in our opinion, are legitimate deductions from the undisputed evidence appearing herein and elsewhere in the record.

In the original opinion, we also said that "In the instant case, Mr. Land, master mechanic of the Salt Company, deceased's foreman, testified, in substance, that he knew it was the custom of Mr. Anderson to crawl under freight cars that happened to block the pathway and had repeatedly cautioned him of the danger of such an undertaking".

The correctness of this conclusion is challenged by appellant in paragraph 62 of its motion for rehearing, saying that "The witness Land did not testify that he knew it was the custom of C. C. Anderson to crawl under freight cars that happened to block the pathway". The Q. and A. report of Mr. Land's examination in regard to the matter under consideration is, as follows: Being examined by appellant's counsel, the witness was asked: "Had you ever had occasion to talk to Mr. Anderson in regard to his manner and method of crossing the railroad track there prior to his injury, Mr. Land? A. Yes, sir." Objections to the testimony as being immaterial and irrelevant were urged at this point. Appellant's counsel retorted: "No, sir, this man (meaning Mr. Land) is his (deceased's) foreman." The objections were overruled and the examination was resumed. Appellant's counsel stated to the witness: "You may answer". "A. I had cautioned him about crawling under those cars at times, yes, sir.

"Q. About how many times had you had occasion to caution Mr. Anderson about crawling under the freight cars? A. I couldn't say."

Certain objections were made and overruled, and the examination was resumed.

"Q. About how many times, please, sir, have you had occasion— A. I don't know, Mr. Harper, I couldn't say about that. I do know a few times, probably two or three or four, I had cautioned him about crawling under there.

"Q. Had you prior to the date of his injury seen him crawl under cars there on

684

the main line and side tracks? A. I don't know about the side tracks, I did the industrial tracks for a period of time."

The testimony of Mr. Land to the effect that he had had occasion to talk to Mr. Anderson in regard to his manner and method of crossing the railroad track, had cautioned him repeatedly about crawling under freight cars, had seen him doing it for a period of time, in our opinion, fully sustains the conclusion called in question and, for the same reason, the objections urged in paragraphs 63, 64 and 65 are not well taken.

We have examined the motion for rehearing by appellant very carefully, and finding same without merit, it is overruled.

Motion overruled.

BOND, C. J., dissents.