Mrs. Lillian M. PARISH and Violet Luella Parish, through her next friend, Mrs. Lillian M. Parish,

v.

PACIFIC INDEMNITY COMPANY.

No. 15246.

United States Court of Appeals, Fifth Circuit.

April 6, 1955.

Rehearing Denied May 19, 1955.

Chris Dixie, Houston, Tex. (John B. Wilson, Jr., Dallas, Tex., Dixie & Ryan, Houston, Tex.), for appellants.

Frank E. Crumley, and George R. Bridgman, Fort Worth, Tex. (Cantey, Hanger, Johnson, Scarborough & Gooch, Fort Worth, Tex., of counsel), for appellee.

Before HOLMES and RIVES, Circuit Judges, and THOMAS, District Judge.

THOMAS, District Judge.

This suit was brought under the Workmen's Compensation Law of Texas, Article 8306 et seq., Vernon's Ann.Civil Statutes, by the surviving widow and the sole minor child, for benefits due as the result of the death of Ratio Preston Parish, an employee of the American Manufacturing Company of Fort Worth, Texas. The claim was that the employee died as a result of injury to his heart, sustained in the course of his employment.

The case was tried to a jury. After all the evidence was in and both sides had rested, the trial judge, sua sponte, instructed a verdict for the defendant insurance company. The sole question here involved is whether or not the evidence was sufficient to go to the jury on the question of causation between the work and the death.

The deceased on the date of his death was fifty-six years of age and weighed two hundred pounds. Prior to his employment with the American Manufacturing Company, he had spent his adult life at manual labor. He began his employment with the American Manufacturing Company in October 1951. The employing company was engaged in manufacturing ammunition for the armed forces. Upon his commencement of work, the deceased was assigned as a loader of a "heat-treat furnace". This job required that he place artillery shells into racks where such shells were then automatically fed into the furnace. This work was described by some of plaintiffs' witnesses as extremely heavy manual labor. Approximately six months prior to his death, deceased was promoted to "heat-treat operator", which work was described by plaintiffs' witnesses as very strenuous; and, contrariwise, described by defendant's witnesses as being considerably lighter than the work done by the loader of the heat-treat furnace. A similar conflict in the evidence exists with reference to additional job duties assigned to the deceased a few days prior to his death.

On the day of his death, the deceased reported for work at 1:00 a. m., and worked his usual eight hours. He left work at 9:00 a. m., reached his home at approximately 9:20 a. m., went to the grocery store with his wife, and returned home around 10:30 or 11:00 a. m. He then retired to his bedroom to rest and remained there until about 3:00 p. m. At 3:00 p. m., he came from his bedroom and told his wife, "I cannot sleep. My shoulders and my elbows and my arms are aching." At his request, his preacher was called and prayer was said. The deceased then returned to his bed and in very few minutes began struggling for breath. An ambulance was promptly called, oxygen was administered, but there was no response and he was dead upon arrival at the hospital.

There was considerable conflict in the testimony as to the duties required of the particular work deceased was engaged in on the date of his death. Appellee insists that, irrespective of the duties, there was no testimony as to the method in which deceased performed those duties. Medical testimony was introduced by both sides. There was no question but that deceased died of a myocardial infarction.

The complaint in part alleged that decedent's "death was not due solely to any pre-existing condition or physical defect or disease which might have existed prior to the aforesaid period, but that

the injuries which Ratio Preston Parish received during the course of his employment during such period of June 1, 1953, to June 10, 1953, would and did cause his death, and that his death was a direct, natural and proximate result of the injuries received by the said Ratio Preston Parish during the course of his employment with said employer during the period aforesaid and would not have occurred but for the over-exertion, undue strain, over-heating and other unusual conditions and injuries to which he was exposed and subjected during the aforesaid period of time."

Was there any evidence in this case on which to base a causal connection between Parish's death and his employment by appellee? If so, the sufficiency of such evidence should have been submitted to the jury; if not, the case should be affirmed.

In deciding this question, the proper approach is to examine the medical testimony from an over-all perspective, rather than considering isolated statements made by the doctors. It seems to us from an over-all consideration of the medical testimony that there was evidence in this case on which causal connection between Parish's death and his employment could be based. While we have said that the testimony should be considered from an over-all perspective, we do point out that in the testimony of Dr. Arthur Grollman (p. 267 of the transcript) the following question was propounded:

"Q. Now, then, let's go back to the hypothetical (question) I gave you. Are you able to state whether or not, in all reasonable probability, taking into the account the work history and the time of his death and the variation and the amounts and circumstances of his work, whether or not there is any connection between the work he was doing on the days before his death and his death when it occurred in the afternoon of June 10, 1953?

"A. I would say it possible, that there could be such a relationship. In other words, he had been under an excessive stress, and therefore since that is undesirable, it naturally did not help him; to make it specifically that that causes it, of course (I) would not say, but there is possibly that relationship and personally I think one might even add a probability of a relationship there."

Again, on page 268, Dr. Grollman states: "I would say again that there was a possibility of that (the work) having initiated the chain of events which finally led to his (Parish's) death."

Again, on page 273, Dr. Grollman was questioned as to whether or not the time element of seven or eight hours between the time Mr. Parish had left his job and the moment of his death excluded the hypothesis or the conclusion that death originated from over-exertion, his reply being, "It would not absolutely exclude it, one cannot, of course, with that long time lag, and in the absence of an examination of the heart in autopsy, say the definiteness of when it started, but one could not, of course, short of an autopsy; but one often sees an autopsy, examining hearts, see patients who have given a history and you thought death came some hours afterwards, that examination of the heart shows very definitely the trouble began some hours, and occasionally even days before, so, it is, I would say problematical."

Dr. Joseph F. McVey, a witness who testified for the defendant-appellee, also had something to say with reference to this time lag (p. 308):

"Q. In other words, if he had died right on the job, or within the first five minutes, you would say, "Yes, you have got something."

"A. Right."

Then again Dr. McVey stated (p. 317):

"Q. So it is a presence or absence of physical exertion that makes a difference to you, more, and not the time lag, necessarily?

"A. That is right."

In the case of Reid v. Maryland Casualty Co., 5 Cir., 63 F.2d 10, 11, this

court, speaking through Judge Hutcheson said:

> "District Judges are pronouncing no mere rigmarole when, in law cases, they charge jurors that they are the sole and exclusive judges of the credibility of the witnesses, and the weight to be given to their testimony. They are setting forth the very substance of a jury trial as guaranteed by the Seventh Amendment to the Constitution. Its purpose and aim 'is not to preserve mere matters of form and procedure, but substance of right. This requires that questions of fact in common-law actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative.' "

Again in the Reid case, supra, the court stated, 63 F.2d at page 12:

> "A District Judge in the conduct of a common law trial in the Federal court has two separate and distinct functions, each equally vital to the just conduct of such trial, each separate and distinct from the other. One, his function before verdict, to determine whether there is any evidence to carry the case, or any issue in it, to the jury. This function requires him to submit every disputed issue to them. That is, every issue in regard to which reasonable minds might draw different conclusions, and to refuse to submit to them issues on which there is no evidence, that is, issues as to the result of which reasonable minds cannot disagree. The other, his function after verdict, to refuse in the exercise of his discretion, to permit a verdict to stand which, though supported by evidence, is in his opinion against the right and justice of the case."

▮ And again in the Reid case the court cited and quoted from Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 233, 74 L.Ed. 720. " 'Issues that depend on the credibility of witnesses, and the effect or weight of evidence are to be decided by the jury. * * * Where uncertainty * * * arises from a conflict in the testimony, or because the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact, to be settled by the jury.' "

Without expressing our opinion as to the merits of the case, we think that the trial court erred in instructing a verdict for the defendant. The judgment is Reversed and the cause is Remanded for further and not inconsistent proceedings.