**NATIONAL SURETY CORPORATION,**
Appellant,

v.

**Mrs. Ollie BELLAH, and husband, W. F.**
**Bellah, Appellees.**

No. 16366.

United States Court of Appeals
Fifth Circuit.

June 10, 1957.

Rehearing Denied July 27, 1957.

W. Richard Bernays and Touchstone, Bernays & Johnston, Dallas, Tex., for appellant, National Surety Corp.

John B. Wilson, Jr., Dallas, Tex., for appellees.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal from a judgment on a jury verdict for total permanent compensation benefits under the Texas Act presents the age-old, constantly recurring problem, Rodriquez v. Great American Indemnity Co., 5 Cir., 1957, 244 F.2d 484, of whether the facts meet the essential dualism of art. 8309 that the injury (1) originate in the work, business, trade or profession and (2) be received while engaged in the furtherance of the employer's business.[1] An added, substantial question arises whether art. 8306, Sec. 12e, concerning the procedure for surgical operations shall be obliquely applied, as did the trial court, to keep the admitted truth from the jury.

The facts, virtually without dispute, and certainly ample to warrant these inferences, may be easily summarized:

Mrs. Bellah, the Employee, was engaged as a sewing machine operator for Dallas Pants Manufacturing Company, the Employer, whose plant, the operation

1. Art. 8309, Vernon's Revised Civil Statutes, Texas, the term "injury sustained in the course of employment" is defined: " * * * shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

of which was indiscriminately commingled with the activities of its related, family held, affiliate, the Haggar Company, was located in an area of industrial concentration in Dallas, Texas. For efficiency in operation, to reduce overhead and possible overtime, the workday of the hourly piece-rate workers prescribed a thirty minute lunch period. Since the few drive-ins or hamburger, short order eating places in the nearby neighborhood were inadequate to serve a force of two hundred fifty people, and the alternative of going to restaurants one-half to one mile or more away involved considerable inconvenience in getting cars in and out of the Company's parking lot, exposure to uncomfortable weather conditions of rain or heat, and the likelihood that the employees could not get back on the job within the brief thirty minute period, the Employer established a company restaurant on the common premises of the Employer and its affiliate in a building next to the factory building in which the Employee worked.

2. The Cafe was for the exclusive use of the employees of Dallas Pants Mfg. Co. and the Haggar Company and their business guests or invitees. The public was excluded. It was agreed between the operator and the Employer that she was to serve a plate lunch of two vegetables, a salad and meat for fifty cents, and about which the cafe operator testified:

"Q. Is there any place in a two mile radius that serves that kind of food for fifty cents? A. No, sir.

"Q. Have you ever—if you were paying rent and running your own place you could not serve food for that, could you? A. I do not pay any bills there, as I told you.

"Q. That is the reason you can serve that kind of food at that price, you don't have any overhead? A. Yes.

"Q. The Haggar Company takes care of the overhead because they want their employees to eat in that cafe, right? A. Yes."

Employees were entitled to the use of the tables and chairs to eat their lunch whether they brought it (as many did), purchased food or drinks or not. With this facility available, the Company rule expressly forbade employees eating lunch in the factory rooms where food particles might soil materials or finished products.

Known variously as the "Haggar Cafe" or "The Haggar Company Cafe," it was operated by a Mrs. McElree whose exact legal status seems immaterial although it was considerably less than the independent American-free-business-enterprise painted by the Insurer. She did pay the wages, social security and withholding taxes for her own help, the insurance on them and purchased and paid for the food served and stood to lose or gain by the Cafe's operation. But the Employer not only furnished, maintained and repaired the premises and all furnishings, operating equipment and utilities without cost, but paid her a $50 a month guaranty. The Employer had the right, and exercised it occasionally, to use the cafe room for Company meetings to the exclusion of restaurant operations and admittedly laid down definite, principal operating policies.[2]

It was on November 1, 1955, that the Employee, using the Cafe as the Employer intended,[3] sustained injuries when she slipped on the ubiquitous "foreign

3. The Personnel Director for these affiliated companies summed it up:

"Q. And the restaurant facilities within a radius of a mile of that place could not serve all the people at lunch that work in those places, that work in that area, would they? A. I don't believe so.

"Q. And that is the reason you have the company cafeteria there at Haggar's? A. I am sure it is.

"Q. It is provided there for the benefit of the employers the Dallas Pants Manufacturing Company and the Haggar Company; they have that cafe there so they can have the thirty minute lunch period there to eat their lunch and to have them back on the job? A. Yes.

"Q. And that means they don't have to keep the plant open as long as they would if they had to give a longer lunch hour period than the thirty minute period? A. No, sir.

"Q. That cuts down on operation costs? A. Yes.

*      *      *      *      *

"Q. So, it is very beneficial to the employer to have that cafe for them to have a place to eat their lunch? A. Yes.

"Q. That is an inducement for employees to come to work in that company, to eat in that cafe, that would be one of the reasons why it is there? A. Well— yes, I guess so."

or greasy substance" on the floor of the Cafe as she proceeded to a table with a Coca Cola which she had just purchased.

■■ That the Employee, as did others, punched out her time card and was drawing no pay for the thirty minute lunch period is, of itself, not decisive. Texas Employers' Insurance Association v. Inge, 146 Tex. 347, 208 S.W.2d 867. For, "to entitle an injured employee to compensation, it is not required that he be discharging some specific duty connected with his employment at the time of injury. In regard to such matter, it is sufficient if it is shown that the risk was incidental to the work being performed,"[4] Safety Casualty Company v. Wright, 138 Tex. 492, 160 S.W.2d 238, 242; Liberty Mutual Insurance Company v. Nelson, 142 Tex. 370, 178 S.W. 2d 514. Nor "* * * was it necessary that the accident should have occurred during the hours of actual service * * *," Texas Employers' Insurance Association v. Anderson, Tex. Civ.App., 125 S.W.2d 674, 677, writ of error refused.

■ Flowing like the rivers of waters uninterruptedly from the fount, In re McNicol, 215 Mass. 497, 498, 102 N.E. 697, L.R.A. 1916A, 306; New York Casualty Co. v. Wetherell, 5 Cir., 193 F.2d 881, with only occasional diversions as it leaves the banks in application here and there, see Rodriguez v. Great American Indemnity Company, 5 Cir., 1957, 244 F.2d 484, the principle of the Texas rule on injury in the course of employment remains constant. Applying it here, we think this presented a question of fact for jury decision, Liberty Mutual Insurance Company v. Nelson, 142 Tex. 370, 178 S.W.2d 514; Parish v. Pacific Indemnity Company, 5 Cir., 221 F.2d 483, 486; Reid v. Maryland Casualty Company, 5 Cir., 63 F.2d 10, 11, which was adequately supported.

While the line may appear to be hard to draw between those marginal activities which are,[5] or are not,[6] within the scope of the Texas Act, the significant factor appears to be the existence of a substantial relationship between the act being done by the employee and the advancement of the employer's business affairs during the period of time when it would have important bearing on its accomplishment. This means that in many cases it is the employer himself who thus fixes the line. To one employer, the unique nature of his operations, location of the place of business, availability of labor supply, or other similar factors may make it essential in his business judgment that certain facilities be supplied for the use of employees. To another employer a similar facility would be but a generous gratuity or privilege which, while available for and used by employees, would be in their, not the employer's, interest and business.

Here, for good reason, the Employer found it to his own business advantage to maintain a cafe for its employees. It was established because businessmen, in the exercise of business judgment,

4. The court's instruction being an almost literal paraphrase of this opinion was, intrinsically and in context, eminently proper and this disposes of the Insurer's Fifth Point complaining of it.

5. The Employee relies on: Fidelity & Casualty Co. of New York v. Mitchell, 5 Cir., 134 F.2d 537; Texas Employers' Insurance Association v. Davidson, Tex. Civ.App., 295 S.W.2d 482, writ of error refused, NRE; Lumberman's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S. W. 72, 28 A.L.R. 1402; Kirby Lumber Co. v. Scurlock, 112 Tex. 115, 246 S.W. 76; Federal Surety Co. v. Ragle, Tex Com.App., 40 S.W.2d 63.
See also General Ins. Corp. v. Wickersham, Tex.Civ.App., 235 S.W.2d 215, writ of error refused, NRE.

6. The Insurer counters with these: Holditch v. Standard Accident Insurance Company, 5 Cir., 208 F.2d 721; Banks v. Commercial Standard Insurance Company, Tex.Civ.App., 78 S.W.2d 660, writ of error dismissed; McKim v. Commercial Standard Insurance Company, Tex. Civ.App., 179 S.W.2d 357, writ of error refused; London Guaranty and Accident Company v. Smith, Tex.Civ.App., 290 S. W. 774, writ of error refused; Jasper v. Texas Employers' Insurance Association, Tex.Civ.App., 206 S.W.2d 646; Smith v. Texas Employers' Insurance Association, 129 Tex. 573, 105 S.W.2d 192.

concluded that it helped in the manufacture of·men's clothing to provide an inexpensive, convenient place for employees to eat, so that within a very limited time they could return to active production operation. Initiated and subsidized by the Employer, it evaluated this cafe as an important, if not essential, facility. And employees using it were doing exactly what the Employer desired, for the reasons desired, at the time desired.

■ That these employees, while at, going to or from near, or faraway, public restaurants had no company cafe been provided, would have been wholly on their own without compensation coverage, note 6, supra, merely bears out the wisdom of this rule. For in not setting up any such establishment, the employer reflects the conclusion that his trade and business are not directly advanced. Of course, the subjective wishes or conclusions of an employer cannot take from employees the rights which the Compensation Act generally would afford them, but by his managerial action, he may expand coverage considerably when he, as he alone can do, determines what is the nature and scope of his affairs and the value of these actions as a business matter.

Here, the coincidence of use, time and place were all of the Employer's making. When so used, the activity by its nature both *originated* in the Employer's business and occurred *while* engaged in the activity treated by it as a part of its business. This, as in the surprisingly similar case, Texas Employers' Insurance Association v. Davidson, 1956, Tex.Civ. App., 295 S.W.2d 482, writ of error refused, NRE, brought the accident within Article 8309, Section 1. The Insurer's attack on the jury verdict and the insufficiency of the evidence thus fails.

The charge adequately and fairly set forth the underlying principle of the Texas rule. It was not defective in the particulars complained of and the Insurer's requested instruction No. 1 was a mere rephrasing of matters already submitted.

But when it comes to the procedural point of the exclusion of medical testimony, we think the trial court, applying too literally two Texas cases, each of which cited two of ours,[7] fell, or was pulled, into error.

The sequence of events is here important: the injury occurred November 1, 1955. The final award of the Texas Industrial Accident Board, art. 8307, § 5, Vernon's Texas Civil Statutes, was issued February 20, 1956, followed March 16 by the Employee's suit to set it aside, art. 8307, § 5, supra. On November 1, the Employee was sent by the Employer to its regular company doctor for treatment which continued intermittently up to the time of trial held July 11, 1956. Up until two months before trial, the Employee's condition was diagnosed as injury to the lower dorsal area of the back and muscle spasm caused by a disturbance of extensive intervertebral calcium deposits. Conservative treatment and therapy were administered and the condition was considered to be of a temporary nature showing marked and almost complete recovery. Two months before trial, these doctors, for the first time, concluded that she was suffering from a ruptured intervertebral disc which, unrepaired, was deemed to be a permanent and totally disabling condition.

On the trial the Insurer proffered, with an adequate record, categorical testimony from each of these doctors that while a herniated disc in her case was deemed permanent if unrepaired, the

7. Our decision, Hartford Accident and Indemnity Company v. Black, 5 Cir., 193 F.2d 971, 974, relying almost altogether on hernia cases under Section 12b of Art. 8306, considered obliquely in Robertson v. National Surety Corporation, 5 Cir., 208 F.2d 642, may have set this in motion. For both are cited by the Court of Civil Appeals in the subsequent decisions, Texas Employers' Insurance Association v. Kubiak, Tex.Civ.App., 276 S.W.2d 909, writ of error refused NRE, and American General Insurance Company v. Quinn, Tex.Civ.App., 277 S.W.2d 223, writ of error refused, NRE.

probability of recovery by surgery was excellent. Specifically they testified that instead of total disability, there would be a maximum of three to six months post-operative total disability, followed by a few months temporary partial disability up to 50%, with zero to 10% permanent partial incapacity thereafter.

But the Court, adhering to his earlier pretrial order, excluded all of this testimony and forbade counsel discussing this in any way before the jury. Obedient as he had to be to this ruling, Counsel for the Insurer dutifully played his part, as did the doctors and all of the other actors, as this fiction was unfolded to the jury.

The upshot of it was that the jury did not know that for herniated disc surgical repair was an accepted medical practice, was considered highly successful and safe, and in this case, after a brief period of post-operative disability, would probably either completely, or nearly so, cure this lady.

The question then is squarely posed: was there an adequate reason to deprive the jury of the full truth? Can there be here a policy which hobbles the witness to state that which he knows is not the whole truth, and which denies to the trier the truth as it really is, not what it is made to seem?

■ There may, of course, be situations, e. g., statute of frauds, dead man's statute, parol evidence rule, in which time-honored and century-proved policies cut off from the judge or jury knowledge of facts. But, presiding as we do, to administer justice, we should hesitate long either in establishing, or in acquiescing in any new rule which bars the receipt of credible, relevant, probative evidence bearing directly on the truth of a significant issue.

■ Erie compels us to accept the holding of Kudiak and Quinn, note 7, supra. But it does not compel, we see no need for, and see much harm in, carrying them one step beyond what, with deference, we consider already an outer and doubtful limit.

These cases, taking the decisions[8] construing the hernia section, art 8306, Sec. 12b, and applying them to general surgical situations, hold that, as in the case of hernias, the insurer on the trial of a compensation suit, to prove that an operation is safe and will likely be effective to reduce disability, must establish that it admitted liability and *tendered* the operation while the matter was still pending before the Industrial Accident Board.

But these underlying decisions proceed on the premise that while the claim was yet pending before the Board, the medical condition was known and known to require a surgical operation. They stem from the Texas view that superintendence of a hernia operation is a matter for which the Board alone, and not a court, is competent. There is nothing to suggest that they flow from a purpose to create a judicial sanction to admission of liability as an appendage to a structure which, as compensation statutes go, is singularly free from traditional coercion and penalties.[9]

---

8. Between them Kudiak and Quinn cite and rely on Texas Employers' Insurance Association v. Phelan, Tex.Civ.App., 103 S.W.2d 863; National Mutual Casualty Co. v. Lowery, 136 Tex. 188, 148 S.W.2d 1089; Texas Employers' Insurance Association v. Neatherlin, Tex.Com.App., 48 S.W.2d 967; Federal Underwriters Exchange v. Thompson, 136 Tex. 194, 148 S.W.2d 1092; Texas Employers' Insurance Association v. Tally, 132 Tex. 547, 125 S.W.2d 544; Employers' Liability Assurance Corp., Ltd. v. Williams, Tex.Civ.App., 293 S.W. 210, writ of error dismissed; Lewis v. American Surety Co., 143 Tex. 286, 184 S.W.2d 137.

9. There are no criminal sanctions. The only civil sanction is withdrawal of common law defenses of contributory negligence, fellow servant and assumed risk. Art. 8306, Sec. 1–3a. Compensation is payable currently as it accrues, but the right of the insurer to bring suit, Art. 8307, § 5, to set aside award of Board is absolute, Art. 8306, § 18, and statutory 12% penalty, Art. 8307, § 5a, for non-compliance with Board's order does not apply if suit to set it aside is timely filed, Mingus v. Wadley, 115 Tex. 551, 285 S.W. 1084. In suit to set aside award the issues of employer-employee relationship, coverage, accidental injury, disability, and

■ And these decisions must also be read in the light of the dominant factor in the Texas Workmen's Compensation Act that once the appeal is taken from the Industrial Accident Board, the Board is powerless to take any action whatsoever. Art. 8307, Sec. 5, Vernon's Texas Civil Statutes Ann.; Zurick General Accident & Liability Ins. Co. v. Rodgers, 128 Tex, 313, 97 S.W.2d 674; Associated Indemnity Corporation v. Peel, Tex.Civ. App., 157 S.W.2d 416, writ of error dismissed.

Here, of course, on the Employee's own theory, no one knew until long after the Board had lost jurisdiction that she either suffered from a condition requiring surgery, or that it could safely and successfully be performed. Nor can it be urged that this consequence must still flow because subsequent events establish as a legal proposition that the need for surgery ought to have been discovered while the claim was still before the Board. Where the need for an operation of a specific kind is not patent while the matter is before the Board, the whole policy of the Act and the right of the parties to contest one or more issues while admitting the others, note 9, supra, would be impeded by retrospectively considering what ought to have been, but was not, known or done before the Board.

Moreover, an extension of this asserted rule, produces unrealistic and absurd results which almost ignore, as though it had never come to pass, the miraculous development of modern medical and surgical science. Just what is surgery? Would it include the prick of the hypodermic needle injecting cortisone for relief of arthritis, the piercing of an eardrum or sinus to drain an infected area, the insertion of a needle for a blood transfusion, the introduction of a dye in spinal fluid or internal organs for myelograms,[10] fluoroscopes or X-rays, the fixation or immobilization of bony structure by casts, weights or pins?

And, unless a reputable doctor is to obliterate altogether from his scientific consciousness the knowledge that has come to him from his prolonged study, clinical practice and experience, how can he possibly evaluate disability in terms that do not take into immediate account these marvelous developments to relieve mankind of the toll of suffering and incapacity? By this rule a doctor would be forced to testify that a man lying with a broken leg from a compound fracture is "legally" forever and totally disabled because the easy and likely successful reduction of the fracture will require slight, but essential, incisions.

■ And yet that is the effect of the application of this rule as to this Employee who, by testimony neither true, honest, nor accurate, was portrayed as a hopeless physical wreck though known to all save those to whom the cause was committed for decision was the medical

---

wage rate are separable issues, only a formal few of which need be raised by verified pleading, Tex.Rules Civ.Procedure, rule 94, notes (1) through (7), cf. Employers Mutual Liability Ins. Co. of Wisconsin v. Blunt, 5 Cir., 227 F.2d 312, certiorari denied 350 U.S. 994, 76 S. Ct. 543, 100 L.Ed. 859. Moreover, in a hernia claim, the question is whether it comes under the specific section or general provisions. If the operation is not tendered then by virtue of the statutory language, the employee " * * * shall be entitled to compensation for incapacity under the general provisions of this law * * *," Art. 8306, Sec. 12b. But for a general injury (back), the general provisions apply generally and altogether. The furnishing or withholding of an op-

eration in no way invokes an alternative standard and cannot, as in hernia cases, supply another basis for computing liability.

10. As to this Employee, the classic reflex tests were essentially negative. A myelogram is (or the jury might conclude) a standard verifying test. This was not used here, but since the technique might involve an "operation," the trial court under the spell of Kudiak and Quinn declined to permit proof that the test itself was *not* performed. This fact obviously went to the accuracy and weight of the medical opinion that a ruptured disc existed. This means that not only as to the disabling consequences of the *condition* but as to the *existence* of that condition the jury is denied the full truth.

fact that by a safe and accepted surgical procedure, she could be restored to health and capacity. The truth was forgotten. The jury was judging of a fiction. The machinery of the law was pretending to a decision. Neither here nor in a Texas court should or would the quest for truth be blocked by any such judge-made rule.

Consequently, the cause is reversed and remanded in part for a new trial free from this error on the issue of resulting disability.

Affirmed in part and reversed and remanded for a new trial in part.